NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING
MOTION AND, IF FILED, DETERMINED

IN THE DISTRICT COURT OF APPEAL

OF FLORIDA

SECOND DISTRICT

RICHARD STARKS, JR.,                          )
                                              )
            Appellant,                        )
                                              )
v.                                            )           Case No.  2D15-1762
                                              )
STATE OF FLORIDA,                             )
                                              )
            Appellee.                         )
                                              )
_____ )

Opinion filed March 22, 2017.

Appeal from the Circuit Court for Pasco
County; Susan L. Gardner, Judge.

Howard L. Dimmig, II, Public Defender, and
Carol J. Y. Wilson, Assistant Public
Defender, Bartow, for Appellant.

Pamela Jo Bondi, Attorney General, and
Susan M. Shanahan, Assistant Attorney
General, Tampa, for Appellee.


BADALAMENTI, Judge.

            Richard Starks, Jr., appeals his jury conviction for second-degree murder.

Starks's charge stems from his fatal beating of a guest at a house party.  He contends

that the trial court erred by denying his motion for judgment of acquittal because it

erroneously determined that punching a victim to death is imminently dangerous under

Florida's second-degree-murder statute. We hold that the State presented sufficient evidence to establish that Starks's barehanded punching of an unconscious and seated victim was "imminently dangerous" conduct within the meaning of section 782.04(2), Florida Statutes (2011). We affirm Starks's conviction in all respects.

## I. FACTS AND PROCEDURAL BACKGROUND

Viewed in the light most favorable to the jury's verdict, the trial evidence demonstrated as follows: On a late Saturday evening, Starks was a guest at a house party in Pasco County along with the victim, Sam Smith. The victim was one of the first guests to arrive at the party, arriving at approximately 6:00 p.m., with both his fiancée and his younger sister. Starks arrived to the party later in the evening.

Immediately upon his arrival, Starks was hostile to the victim. Starks initially mistook the victim for someone named Brian, whom Starks disliked. Starks's demeanor toward the victim—who he thought was Brian—became loud and aggressive. The victim did not respond to Starks's hostility but instead tried to back out of the situation. Eventually the victim's identity was cleared up, but this incident was only the first in a series of Starks's provocations toward the victim.

Later in the evening, the victim commented that Starks was a "ginger"—a person with red hair. Starks took great offense to the label, even though he did not seem to understand what it meant, and he angrily confronted the victim a second time that evening. Starks indicated that he wanted the verbal confrontation to become physical, but the victim again declared that he did not want to fight Starks.

The third confrontation between Starks and the victim would prove to be fatal. Toward the end of the night, the victim was sitting in a plastic chair outside of the

house, underneath a carport. The trial testimony reflects that, at this point in the festivities, Smith "had started drinking quite a bit" and had become "very incoherent, laying in the chair." Starks was also outside in the area where the victim was seated. The victim overheard the party's host speaking with the victim's fiancée. The victim interpreted this interaction as flirtation and made a comment to the host while still seated in the plastic chair. At that point, Starks inserted himself into the fray and told the victim not to "insult [his] friend like that."

The victim ignored Starks's third attempt at provocation that evening, but Starks nevertheless advanced toward the still-seated victim. The victim never attempted to put his hands up in defense, to get out of the chair, or to try and defend himself in any manner. One of the guests attempted to intercept Starks before he reached the victim, but Starks broke free and punched the seated victim on the left side of his face. Starks's first punch knocked the victim unconscious and the victim's body went limp in the plastic chair.

A guest then pulled Starks back from the victim's limp body, but Starks broke free a second time, landing a second series of punches to the head of the still-seated, still-unconscious, and still-limp victim. Yet again, a guest attempted to restrain Starks, but Starks broke loose for a third time, delivering a third series of punches to the defenseless victim's head. In total, Starks broke free from three attempts by partygoers to restrain him. The partygoers who witnessed the entire attack testified that Starks landed between six and twelve punches to the victim's head, despite the victim appearing incoherently drunk prior to being hit and despite Starks's first punch having rendered the victim unconscious.

A party guest testified that, after Starks was pulled away from the victim a final time, she heard Starks repeatedly bragging about how he had "whooped" the victim.

The party's host then told Starks to leave and the host's girlfriend called 9-1-1. At the conclusion of Starks's series of attacks, the unconscious victim was slumped over in his chair, his face looked pale and bruised, his neck was awkwardly turned, his nose and mouth were bleeding, there was a pained expression on his face, and he did not appear to be breathing normally. The party's host attempted to perform CPR on the victim for approximately twenty minutes, until law enforcement officers and paramedics arrived at the scene at approximately 1:00 a.m.

A paramedic who responded to the incident testified that the victim was not breathing and had no neural activity but did have a faint heartbeat. The paramedic stated that the victim had blood around his mouth and nose, that the victim's jaw appeared broken, and that the orbits of the victim's eyes were bruised and swollen. The paramedic remarked that, due to the injuries to the victim's jaw, he did not require a laryngoscope to open the victim's mouth, which was "highly unusual." Instead, the paramedic merely used his hand and forefinger to pull the victim's injured jaw down and gain sight of the victim's vocal chords in order to place an artificial airway device.

The victim was transported to a hospital, arriving at approximately 3:00 a.m., and was pronounced dead soon after. When the party's host contacted Starks and informed him of the victim's death, Starks profanely indicated that he did not care. In fact, Starks tried to get one of the guests from the party to help set up an alibi

for where Starks had been that night, but the guest refused to help Starks in that manner.

A medical examiner testified that the victim's cause of death was blunt trauma to the head and neck and that the manner of death was homicide. The examiner explained that he found multiple injuries to the victim's body, including a broken bone in the victim's neck, a cranial hemorrhage, and multiple soft-tissue injuries to the victim's face. The examiner opined that the cranial hemorrhage was likely the fatal injury to the victim, insomuch as it likely affected the victim's ability to breathe. The examiner also opined that there was no way for the victim to suffer the variety of injuries that he suffered from just one punch. Instead, the examiner opined that the victim's injuries were indicative of being punched at least three times or perhaps as many as one hundred times.

On redirect examination, the State asked the examiner if striking someone who is already unconscious is "imminently dangerous." The examiner sought clarification for this question by asking the State if it meant to inquire, "Would that be bad to strike an unconscious person?" The State agreed with the examiner's rephrasing of its question, and the examiner then answered, "In general terms, yes."

On recross examination, Starks's counsel dwelled on this point by immediately asking the examiner if he meant that striking an unconscious person was "just bad" but not "imminently dangerous." The examiner clarified, "I don't really know what 'imminently dangerous' is but if you have somebody that's been beaten to unconsciousness and you continue that would, you know . . . not be good for their health."

At the close of the State's case-in-chief, defense counsel moved for judgment of acquittal. The basis for the motion was narrow. Defense counsel argued only that the State had failed to prove Starks's actions on the night of the homicide were imminently dangerous. The thrust of defense counsel's motion was derived from the testimony of the medical examiner. Specifically, defense counsel took the medical examiner's testimony to mean that punching an unconscious person was not imminently dangerous and therefore could not support a conviction of second-degree murder. Instead, defense counsel suggested that a conviction on the lesser included offense of voluntary manslaughter might be more appropriate. The trial court denied Starks's motion and, because Starks did not present a case-in-chief, the court then charged the jury as to the elements of second-degree murder and six lesser included offenses. The jury found Starks guilty as charged of second-degree murder. The court sentenced Starks to thirty years' imprisonment.

## II. DISCUSSION

Starks argues that the trial court erred by denying his motion for judgment of acquittal on the second-degree-murder charge because the State presented insufficient trial evidence that his punching the victim was imminently dangerous and evincing a depraved mind under section 782.04(2). Starks concedes that his trial counsel did not present argument for judgment of acquittal on all elements of second-degree murder. Instead, his trial counsel limited the motion for judgment of acquittal to whether the State presented sufficient evidence that Starks's continuous punching of the victim after the victim was unconscious was an "imminently dangerous" act.

- 6 -

"In reviewing a motion for judgment of acquittal, a de novo standard of review applies." Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002) (citing Tibbs v. State, 397 So. 2d 1120 (Fla. 1981)).  "If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction."  Id. (citing Banks v. State, 732 So. 2d 1065, 1067 (Fla. 1999)).  "The courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of it favorable to the opposite party can be sustained under the law." Lynch v. State, 293 So. 2d 44, 45 (Fla. 1974).

## A.  Determining Whether an Act is "Imminently Dangerous"

Section 782.04(2) defines second-degree murder as "[t]he unlawful killing of a human being, when perpetrated by any act imminently dangerous to another and evincing a depraved mind regardless of human life, although without any premeditated design to effect the death of any particular individual . . . ."  Our supreme court has explained that, in order to establish an act as "imminently dangerous to another and evincing a depraved mind," the State must show that the act (or acts) was such that "(1) a person of ordinary judgment would know is reasonably certain to kill or do serious bodily injury to another, and (2) is done from ill will, hatred, spite or an evil intent, and (3) is of such a nature that the act itself indicates an indifference to human life."  State v. Montgomery, 39 So. 3d 252, 255-56 (Fla. 2010) (quoting Bellamy v. State, 977 So. 2d 682, 683 (Fla. 2d DCA 2008)); see also Fla. Std. Jury Instr. (Crim.) 7.4 (defining the word "act" to include "a series of related actions arising from and performed pursuant to a single design or purpose").

Starks argues that his repeated punches to the victim's head were not imminently dangerous acts because punching a victim is not "reasonably certain to kill or do serious bodily injury." Montgomery, 39 So. 3d at 255. In fact, Starks goes a step further by inviting us to take a categorical approach. That is, he asserts that a conviction for second-degree murder cannot be sustained where the death is caused by the act of punching. We reject both arguments.

Our analysis begins, as it should, with the statutory text. Section 782.04(2) states that second-degree murder occurs when the death is "perpetrated by any act imminently dangerous." (Emphasis added.) By its plain and ordinary meaning, the phrase "any act" is broad and not limited to a specific kind of act. See § 782.04(2); Fla. Std. Jury Instr. (Crim.) 7.4; see also United States v. Gonzales, 520 U.S. 1, 5 (1997) ("Read naturally, the word 'any' has an expansive meaning, that is, 'one or some indiscriminately of whatever kind.' " (quoting Webster's Third New International Dictionary 97 (1976))).

In accordance with this broad statutory language, Florida case law upholding convictions for second-degree murder logically encompasses a broad range of acts found to be imminently dangerous. See, e.g., Young v. State, 250 So. 2d 922, 923 (Fla. 2d DCA 1971) (act of stabbing the victim with a knife); Henry v. State, 145 So. 3d 924, 928 (Fla. 4th DCA 2014) (act of hitting the victim fifteen to twenty times with a baseball bat); Millan v. State, 932 So. 2d 557, 560 (Fla. 3d DCA 2006) (act of beating the victim with a bat and a tire iron before slitting his throat).

It may be especially obvious that certain acts, like stabbing someone, are more reasonably certain to kill or do serious bodily injury than the act of punching

- 8 -

someone. But the text of the second-degree-murder statute does not call upon trial courts to evaluate imminent danger based on how one defendant's chosen act of inflicting injury upon a victim stacks up against another's. Accordingly, Starks's categorical focus on the general dangerousness of the act of punching belies what the statute's text actually says. The legal analysis does not exclusively turn on the particular act one chooses in order to inflict harm on another. Whether Starks killed the victim by stabbing him with knife, clobbering him with a baseball bat, or punching the victim with his fists is only part of the imminent danger analysis under section 782.04(2).

Whether an act is imminently dangerous turns on the facts of a particular case focusing on whether "a person of ordinary judgment would know" that the act was "reasonably certain to kill or do serious bodily injury" to the victim. Montgomery, 39 So. 3d at 255 (quoting Bellamy, 977 So. 2d at 683); Fla. Std. Jury Instr. (Crim.) 7.4. Thus, our analysis of whether the State presented sufficient evidence that Starks's act of repeatedly punching the victim was "imminently dangerous" will focus on whether Starks's actions were such that a person of ordinary judgment would know that those acts are reasonably certain to kill or do serious bodily injury to the victim.

Apart from the statutory language, Florida courts have repeatedly upheld convictions of second-degree murder for deaths caused by punching. See Storey v. State, 13 So. 2d 912, 913 (Fla. 1943) (upholding a second-degree-murder conviction where a twenty-four-year-old defendant began punching "an inoffensive and unoffending old man in his declining years" while the old man was seated and then continued his barrage as he dragged the old man out of his truck); Dillen v. State, 202 So. 2d 904, 906 (Fla. 2d DCA 1967) (finding that "there was adequate evidence" to

support a conviction of second-degree murder where the State charged defendant with "unlawfully and feloniously mak[ing] an assault" on a minor child "with a deadly weapon, to-wit: his hands and fists"); Larsen v. State, 485 So. 2d 1372, 1373 (Fla. 1st DCA 1986) (finding sufficient evidence to uphold a second-degree-murder jury conviction where defendant struck "hard across the face" his ninety-five-pound wife who was partially physically disabled); see also 2 Wayne R. LaFave, Substantive Criminal Law § 14.2 (2d ed.), Westlaw (database updated October 2016).

A common factor in all of these cases is that they each involved a defendant punching a victim who was especially and visibly susceptible to harm. See LaFave, supra, § 14.2 ("[I]n appropriate cases, generally involving big men attacking small, frail men or women or children, and generally involving the repeated use of hands and feet, an inference of an intent to kill may properly be drawn."). Naturally, these cases do not imply that punching someone will always be imminently dangerous, nor do they imply that a trier of fact is restricted by any specific type of vulnerability that the victim may have been suffering from—older, younger, smaller, or sicker. Again, the analysis of whether a defendant's act is imminently dangerous in the milieu of second-degree murder turns on a case-by-case determination as to whether the defendant's actions were reasonably certain to kill or do serious bodily injury to the victim. See Larsen, 485 So. 2d at 1373 ("The grade or degree of a homicide, and the intent with which a homicidal act was committed are questions of fact dependent upon the circumstances of the case, and are typically for resolution by a jury.").

For example, in Storey, the twenty-four-year-old defendant beat a seventy-year-old victim to death after a minor vehicle accident. 13 So. 2d at 912-13.

The angered defendant got out of his car, ran toward the victim's truck, reached in the truck's window, and began repeatedly punching the victim in the head and face. The defendant then pulled the victim out of his truck, causing the victim's head to hit the truck's running board and the pavement below. Id. at 913. A jury convicted the defendant of second-degree murder. Id. at 912. On appeal, the supreme court held that the facts of the case supported the conviction. Id. at 913. The supreme court explained that the Storey defendant "must be presumed to have intended the natural ordinary consequences of his wilful [sic] and deliberate acts" because one must "have known that by beating an aged man about the head and face as he did, and dragging him from the truck feet first, serious and fatal injuries might result as a consequence." Id. (emphasis added). The Storey court focused on whether the natural ordinary consequences of the defendant's conduct of punching an "aged man" in the head and face and dragging him would ordinarily cause serious bodily harm. Id. As the supreme court instructed, it was immaterial that the victim's death may have been caused by the defendant's punch or something else. Id. ("Whether death came as a result of the blows inflicted by the appellant, or from the fall on the pavement, or from a combination of both, is immaterial."). Instead, the supreme court focused on the defendant's acts and the factual circumstances surrounding those acts to determine whether they were imminently dangerous.

Cases like Storey, Dillen, and Larsen underscore that the relevant inquiry to determine whether a defendant's act is imminently dangerous under section 782.04(2) is whether "a person of ordinary judgment would know" that the defendant's conduct "is reasonably certain to kill or do serious bodily injury." Montgomery, 39 So.

- 11 -

3d at 255 (quoting <u>Bellamy</u>, 977 So. 2d at 683); <u>see also</u> <u>Larsen</u>, 485 So. 2d at 1373 (noting that "the relative harm-causing potential" between the defendant and victim in that case distinguished it from other cases where a second-degree-murder conviction was reversed). The defendant can act by using his fist, a knife, a baseball bat, or any other instrumentality, but the instrumentality is not necessarily dispositive in determining whether the act is imminently dangerous. <u>Cf.</u> <u>Young</u>, 250 So. 2d at 923; <u>Henry</u>, 145 So. 3d at 928; <u>Millan</u>, 932 So. 2d at 560. The inquiry should focus on the whole picture surrounding the victim's death rather than focusing its lens on any one factor as being dispositive.

## B.  The Imminent Danger of Starks's Actions

Having explained the framework for determining whether an act is imminently dangerous, we now turn to whether the State presented sufficient evidence to determine that Starks's punching of the victim was imminently dangerous conduct for purposes of the second-degree-murder statute.

Starks tried to goad the victim into a fight soon after Starks arrived at the house party. Throughout the evening, Starks repeatedly confronted the victim for varied reasons and tried to provoke a fight despite the victim's attempts to avoid confrontation. Starks finally got his chance when the victim was drunkenly sitting in a plastic chair outside of the house. After the victim made an offhand comment about the party's host, Starks seized the opportunity to engage in a physical altercation, charging at the still-seated victim and punching him.

The victim lost consciousness, went limp after Starks's first blow, and never attempted to defend himself. Despite the fact that the victim was slumped

- 12 -

unconscious in his chair and not defending himself, Starks continued to beat the victim's limp, unconscious body in a series of attacks. Even though some of the guests at the party repeatedly tried to restrain Starks—not once, not twice, but three times—he broke free and relentlessly went back to pummel the victim's face and head. The victim was unconscious, never put his hands up, and was visibly slumped in a chair after drinking heavily, but Starks continued to punch him again and again. For purposes of the imminent danger inquiry in section 782.04(2), repeatedly punching a victim in this state—seated, unconscious, defenseless, and appearing very incoherent—is not meaningfully different from punching the victims in cases like Storey, Dillen, and Larsen.[1]

At bottom, this was a savage, one-sided beating upon an unconscious victim by an attacker whose rage had been building from several encounters with the victim throughout the course of an evening. Mr. Starks's actions on that fatal night reveal that he was a combustible element ready to explode upon the unfortunate victim. The State presented sufficient evidence that a reasonable person in Starks's position would know that repeatedly punching the defenseless, limp victim in the face and head was reasonably certain to kill or do serious bodily injury to the victim. See § 782.04(2).

---

[1]We have identified decisions from other jurisdictions, with similar second-degree-murder statutes, upholding convictions for defendants who punched seated, incoherent, or unconscious victims to death. See People v. Cravens, 267 P.3d 1113, 1119 (Cal. 2012) (upholding a second-degree-murder conviction where defendant sucker-punched a "fatigued and intoxicated" victim who had just been jumped by the defendant's friends); People v. Watts, 583 N.Y.S.2d 373, 373-74 (N.Y. App. Div. 1992) (upholding second-degree-murder conviction where defendant knocked the victim down and kept punching the victim after he "lay motionless on the ground"); Wilkerson v. State, 336 P.3d 1188, 1201 (Wyo. 2014) (upholding second-degree-murder conviction where the defendant punched a victim who was seated on a barstool, knocked the victim off the stool, and continued beating the victim).

Viewing the trial record in the light most favorable to the jury's guilty verdict, the trial court did not err in denying Starks's motion for judgment of acquittal. See Pagan, 830 So. 2d at 803 (citing Banks, 732 So. 2d at 1067). The State presented the jury with competent, substantial evidence to conclude beyond a reasonable doubt that Starks's actions on that fatal evening were "imminently dangerous." See § 782.04(2); Pagan, 830 So. 2d at 803 (citing Banks, 732 So. 2d at 1067).

## C. Fundamental Error and Ineffective Assistance on the Face of the Record

Finally, we recognize that Starks attempts to argue that the State also failed to prove the "depraved mind" element of second-degree murder, although Starks laudably admits that he did not preserve this issue in his motion for judgment of acquittal. See Fla. R. Crim. P. 3.380(b) (providing that a motion for judgment of acquittal "must fully set forth the grounds on which it is based").

"A fundamental error 'must reach down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error.'" Monroe v. State, 191 So. 3d 395, 401 (Fla. 2016) (quoting F.B. v. State, 852 So. 2d 226, 229 (Fla. 2003)). To demonstrate that Starks's actions evinced a depraved mind, the State needed to have shown that those actions were "done from ill will, hatred, spite or an evil intent." Montgomery, 39 So. 3d at 256 (quoting Bellamy, 977 So. 2d at 683). As previously explained in detail, Starks repeatedly tried to instigate a fight with the victim over the course of a party lasting several hours and then, when he finally got his chance, Starks mercilessly beat the victim's unconscious body until the victim died. Starks believes that the time frame of his actions that night is not long enough to support a second-degree-murder conviction because "[h]atred, spite, evil

intent, or ill will usually require more than an instant to develop." Light v. State, 841 So. 2d 623, 626 (Fla. 2d DCA 2003) (citing Hooker v. State, 497 So. 2d 982 (Fla. 2d DCA 1986)). But in this case, Starks had more than an instant to develop a depraved mind—indeed, he had several hours. Cf. Morgan v. State, 127 So. 3d 708, 718 (Fla. 5th DCA 2013) (reversing on the basis of an improper self-defense instruction, but upholding the evidentiary basis of defendant's second-degree-murder conviction, where defendant met victim at a bar and murdered him later that night). There is no fundamental error—or any error—with respect to the State establishing that Starks acted with a depraved mind. See Montgomery, 39 So. 3d at 255-56 (quoting Bellamy, 977 So. 2d at 683).

Having found no error with respect to the depravity element in the first instance, defense counsel could not have been ineffective for failing to move for judgment of acquittal on that ground. See Dennis v. State, 109 So. 3d 680, 690 (Fla. 2012) ("[C]ounsel cannot be deemed ineffective for failing to make a meritless argument." (citing Schoenwetter v. State, 46 So. 3d 535, 546 (Fla. 2010))).

We affirm Starks's remaining issue without comment and affirm Starks's conviction in all respects.

Affirmed.


VILLANTI, C.J., and CASANUEVA, J., Concur.