IN THE DISTRICT COURT OF APPEAL
SECOND DISTRICT

GEORGE O. SHRADER,
DOC #101103,

        Appellant,

v.

STATE OF FLORIDA,

        Appellee.

Case No. 2D13-2712

Opinion filed August 23, 2019.

Appeal from the Circuit Court for
Hillsborough County; Emmett L. Battles,
Judge.

Howard L. Dimmig II, Public Defender,
and Richard J. D'Amico, Special Assistant
Public Defender, Bartow, for Appellant.

Ashley Moody, Attorney General,
Tallahassee, and Wendy Buffington,
Assistant Attorney General, Tampa, for
Appellee.

**EN BANC**

BADALAMENTI, Judge.

        Florida Rule of Appellate Procedure 9.331 authorizes a district court of

appeal to rehear, on its own motion or on motion of a party, a prior panel's decision.

The rule calls for a majority of the judges in active service to agree to rehear a case en

banc, which, for our court, is nine judges. See Fla. R. App. P. 9.331(a), (d)(1). Thirteen judges of this court concurred with a decision to proceed en banc and, accordingly, withdrew the panel opinion in Shrader v. State, 41 Fla. L. Weekly D2080 (Fla. 2d DCA Sept. 7, 2016), withdrawn 42 Fla. L. Weekly D2455b (Fla. 2d DCA Nov. 17, 2017). For the reasons explained, we grant the State's Motion for Rehearing En Banc.

## I. INTRODUCTION

A grand jury returned a three-count indictment charging George Shrader with one count of first-degree murder and two counts of sexual battery with a deadly weapon (a knife or any other sharp object) or actual physical force likely to cause serious personal injury. A jury convicted Shrader of both sexual battery counts and of the first-degree felony murder count. See §§ 782.04(1)(a)(2)(c), 794.011(3), Fla. Stat. (1985). The court subsequently sentenced him to a term of life imprisonment on each of the three counts. After careful review of the trial record, the appellate briefs, and the parties' supplemental briefs addressing Knight v. State, 186 So. 3d 1005 (Fla. 2016), we affirm Shrader's felony murder and sexual battery convictions and corresponding life sentences.

## II. FACTUAL BACKGROUND

The evidence adduced at trial, viewed in the light most favorable to the State, established the following facts: Three decades ago in the early morning hours of January 27, 1986, a law enforcement officer discovered the dead body of a female victim lying in the middle of a dirt road. She had been stabbed thirty-six times and was wearing only a T-shirt. She lay in a pool of her own blood, and her body was still warm

to the touch despite it being bitterly cold that morning. The officer noticed that there were signs of a struggle in the area where the victim lay.

Crime scene technicians collected swabs from the victim's vagina and anus as part of a rape-kit protocol. They also collected soil samples containing drops of blood leading away from her body. Those drops of blood did not belong to the victim. The investigation went cold. In 2007, a cold case committee consisting of current and former law enforcement officers, representatives of the State Attorney's and Medical Examiner's offices, and the Biology and Forensics Division of Florida's Department of Law Enforcement recommended that the Hillsborough County Sheriff's Office reopen the case of the unsolved murder of the victim described above. Three years later, a Florida statewide DNA database yielded a match between the DNA collected from the victim's rape kit and Shrader's DNA.

The State brought Shrader to trial in 2013. During the State's case-in-chief, it presented physical evidence and the testimony of seventeen witnesses. Sergeant Robert King of the Hillsborough County Sherriff's Office testified that he discovered the victim's dead body on the early morning of January 27, 1986. The victim's body lay in the middle of a dirt road in an undeveloped peninsula in Hillsborough County known as Whiskey Stump.

Sergeant King described that morning as "bitterly cold" and the temperature as being in the "high 20s, low 30s." Despite the low temperature, the victim's neck was warm to the touch, and Sergeant King observed steam emanating from the victim's dead body. Moreover, the victim was not dressed for cold weather. She was almost completely nude, save for a yellow T-shirt. In fact, the victim was not

dressed in any of the clothing witnesses observed her wearing earlier in the evening, when she was hitching a ride from an establishment known as the Happy Days Lounge to another establishment known as the East Side Lounge.

Sergeant King testified that when he observed the crime scene, he saw "signs of what appeared to be a struggle right there." The State published photographs to the jury of the crime scene and of the victim's slain body. She had been stabbed thirty-two times in the front, side, and back of her body, and she was found lying in a large pool of her own blood, which stained her bare buttocks and thighs. The photographs also displayed four additional wounds—three to her left upper arm and one to her right hand—which the medical examiner testified were defensive in nature. The State presented evidence demonstrating that Shrader's DNA matched not only blood drops leading away from the victim's body, but also semen found inside the victim's vagina and anus.

When cold case investigators Detective Chris Fox and Special Agent James Noblitt interviewed Shrader on January 31, 2011, and February 18, 2011, Shrader denied ever knowing the victim and denied ever having been to Whiskey Stump. And when they showed him a photograph of the victim, Special Agent Noblitt noticed that Shrader immediately looked away without even examining the photo. At the conclusion of their second interview, Special Agent Noblitt invited Shrader to call them if he remembered being with the victim. Despite having repeatedly denied knowing the victim throughout the interview, Shrader responded that he would "meditate and think and see" if he could "figure out what's going on."

- 4 -

The State further presented evidence that Shrader's right hand bore newly acquired cuts to his pinky and ring fingers on January 27, 1986, which was the very same day that Sergeant King had found the victim's body. On that day, Shrader had those cuts sutured at Tampa General Hospital, and when he appeared at the Hillsborough County Courthouse that day to have his fingerprints taken for an unrelated matter, Shrader was unable to give any prints from his right hand because of those recently sutured cuts.

Shrader told a doctor that he received the cuts while working as a roofer. But when one of Shrader's then-roommates inquired as to how he cut his fingers, Shrader told her a different story—that he injured his hand on a nail sticking up from a bannister at their apartment. The roommate testified that she had never gotten more than a scratch from the nail in question and that even her children managed to avoid getting injured by the nail on the bannister.

When Detective Fox and Special Agent Noblitt asked Shrader in February 2011 about the cuts he received on his right hand back in 1986, Shrader claimed that he cut his hand on a knife while reaching into a dishwasher. But Shrader's roommate from that time would testify that they did not even own a dishwasher and that, at any rate, Shrader never washed dishes. And when the cold case investigators asked Shrader where he received his sutures back on January 27, 1986, Shrader responded: "At the hospital." But when asked which hospital, Shrader hesitantly claimed that he did not recall. Shrader then changed his story and claimed that he never received sutures at all, before finally answering that he did not remember one way or another.

At the close of the State's case-in-chief, Shrader moved for judgment of acquittal on the two sexual battery counts and the felony murder theory, arguing that the State's evidence failed to establish that any sexual battery had occurred. Specifically, defense counsel argued:

> It is a reasonable hypothesis to assume that at some point, if the [S]tate is arguing that Mr. Shrader killed this decedent, that there's no evidence produced by the [S]tate to prove that they did not have consensual sex; and, then ultimately, later, she was killed. That activity of sex would have occurred before the killing and therefore would not be sexual battery if it was consensual in nature.

Defense counsel continued: "The State is trying to prove sexual battery, I would argue, through circumstantial evidence." The trial court denied Shrader's motion, ruling that after "[l]ooking at the evidence in the light most favorable to the [S]tate, . . . there is competent, substantial evidence for this to go forward." The court thus submitted the case to the jury for its consideration. The jury returned verdicts of guilty as charged.

## III. APPELLATE PROCEDURAL HISTORY

A split panel of our court reversed Shrader's convictions and sentences. See Shrader, 41 Fla. L. Weekly at D2082-83.[1] The thrust of the panel's opinion centered on the State's purported lack of evidence to prove that the sexual intercourse between the slain victim and Shrader was nonconsensual. See id. at D2082-83. The panel's dissenting opinion cited the supreme court's opinion approving the Fifth District

---

[1]Although the panel's opinion was published in Florida Law Weekly's hardcopy publication, Shrader, 41 Fla. L. Weekly at D2080, it is unavailable for viewing electronically on either Florida Law Weekly or Westlaw's online databases because our court withdrew the prior panel's opinion. Shrader, 42 Fla. L. Weekly at D2455b. The panel's withdrawn opinion is, however, available for viewing at https://efactssc-public.flcourts.org/casedocuments/2017/2172/2017-2172_petition_68721_appendix2dpetition.pdf (last visited on Aug. 16, 2019).

Court of Appeal's decision in Knight v. State, 107 So. 3d 449 (Fla. 5th DCA 2013), approved, 186 So. 3d 1005 (Fla. 2016).

The State timely filed a motion for panel rehearing and, alternatively, a motion for rehearing en banc, asserting that this case is one of exceptional importance and was in conflict with decisions of this court. The State set forth its two core concerns in its introductory paragraph of its motion for rehearing. Specifically, it argued that the panel opinion was contrary to decisions of our court because it effectively (a) retried the case or reweighed the evidence and (b) did not heed the principle of law that a "victim's consent is a jury issue." Motion for Rehearing, Rehearing En Banc (Sept. 22, 2016) (citing Bradford v. State, 460 So. 2d 926 (Fla. 2d DCA 1984); State v. Hudson, 397 So. 2d 426 (Fla. 2d DCA 1981)). On November 9, 2016, the panel granted the State's motion for panel rehearing. But the panel's order did not vacate its prior panel opinion.[2] The panel solely sought supplemental briefing on Knight v. State, 186 So. 3d 1005 (Fla. 2016), and gave no indication in that order that it would address the core issues raised by the State in its motion for rehearing.

An overwhelming supermajority of the judges of this court, thirteen of the fifteen participating in the vote, concurred in an order vacating the panel's decision. Order Withdrawing Opinion, 2016 WL 4649190 (Nov. 17, 2017). The dissent accuses this court of acting beyond its legal authority by vacating the panel opinion and

---

[2]That order further stated: "The State's motion for rehearing en banc is denied as moot." We strike that sentence from the panel's November 9, 2016, order.

proceeding en banc with this appeal.  Simply stated, contrary to the dissent's assertion, there was no infringement of the constitutional authority of a three-judge panel.[3]

Florida Rule of Appellate Procedure 9.331(a) permits en banc review either when the case or issue is of exceptional importance or when review by the entire court is necessary to maintain uniformity in the court's decisions.  As will be explained, the panel opinion vacated by this court is legally inconsistent with prior opinions of this court and the Florida Supreme Court.  See Chase Fed. Sav. & Loan Ass'n v. Schreiber, 479 So. 2d 90, 91, 93 (Fla. 1985) (explaining that "district courts are free to develop their own concepts of decisional uniformity" and "[c]onsistency of decisions within each district is essential to the credibility of the district courts").  After careful consideration of the issues raised in the State's motion for rehearing en banc, this court chose to exercise its duty to hear this case en banc.  It did so to address the concerns raised by the State in its motion for rehearing on which Knight has little or no bearing.

As set forth in detail below, the panel opinion deviated from settled principles of law by, at a minimum, (1) usurping the jury's role to determine issues of consent, (2) reweighing evidence, (3) constructing "could have" views of the evidence in the light most favorable to a criminal defendant, not the State, and (4) substituting its

_____

[3]The dissenting opinion proclaims that our en banc court decision here "advances a dangerously expansive notion of the court's en banc authority" by encroaching on the constitutional province of a three-judge panel.  We find it inappropriate to comment as to any decision-making communications of this court.  We further note that Shrader has previously filed a petition for writ of prohibition in our supreme court asserting that our en banc court acted beyond its jurisdiction by vacating the panel's opinion.  The supreme court denied Shrader's petition as follows: "The petition for writ of prohibition is hereby denied because petitioner has failed to demonstrate that a lower court is attempting to act in excess of its jurisdiction."  Shrader v. State, SC17-2172, 2018 WL 542350, at *1 (Fla. Jan. 25, 2018).

judgment for that of the jurors, who found Shrader guilty of felony murder and two counts of felony sexual battery. It is the duty of this en banc court to ensure uniformity in the rule of law as much as it is the prerogative of this en banc court to vacate a panel opinion that is simply incorrect, misleading, and disruptive to the settled rule of law.[4]

## IV. DISCUSSION

"In reviewing a motion for judgment of acquittal, a de novo standard of review applies." Starks v. State, 223 So. 3d 1045, 1048 (Fla. 2d DCA 2017) (quoting Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002)).[5] "Generally, a motion for judgment of acquittal should be denied '[i]f, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt.' " Westbrooks v. State, 145 So. 3d 874, 877 (Fla. 2d DCA 2014) (alteration in original) (quoting Pagan, 830 So. 2d at 803); see also Lynch v. State, 293 So. 2d 44, 45 (Fla. 1974) ("The courts should not grant a motion for judgment of acquittal unless the evidence is such that no view which the jury may lawfully take of

---

[4]The dissent further claims that this case is also not of the kind to be labeled as one of exceptional importance. We respectfully disagree. As we view it, a panel opinion's failure to follow both supreme court and our court's law renders this case one of exceptional importance.

[5]The dissent suggests that the panel opinion properly employed a de novo review of Shrader's motion for judgment of acquittal in its panel decision. Although we agree that the panel opinion stated that it was conducting a de novo review of the denial of the motion for judgment of acquittal, it conducted anything but a proper review. The panel opinion failed to explain that our de novo review must yield an affirmance of a conviction if it is supported by competent, substantial evidence. See Boyd v. State, 910 So. 2d 167, 180 (Fla. 2005) ("We assess a trial court's ruling on a motion for judgment of acquittal on a de novo standard of review and affirm the conviction if it is supported by competent, substantial evidence.").

it <u>favorable to the opposite party</u> can be sustained under the law."  (emphasis added)).

As our supreme court has explained:

> Where there is room for a difference of opinion between reasonable men as to the proof or facts from which an ultimate fact is sought to be established, or where there is room for such differences as to the inferences which might be drawn from conceded facts, the Court should submit the case to the jury for their finding, as it is their conclusion, in such cases, that should prevail and not primarily the views of the judge.

<u>Lynch</u>, 293 So. 2d at 45.[6]

_____

[6]The panel opinion also improperly set forth the evidence in the light most favorable to Shrader, not the State, contrary to settled case law.  <u>See</u> <u>Pagan</u>, 830 So. 2d at 803; <u>Lynch</u>, 293 So. 2d at 45; <u>Starks</u>, 223 So. 3d at 1049.  Instead of drawing all inferences in favor of the State, the panel opinion attempted to provide contrived examples as to how the evidence "could have" boded <u>in favor of Shrader's attorney's argument in support of the motion for judgment of acquittal</u>; namely, that the victim consented to sex with him prior to her being killed.  We note that Shrader's attorney's argument in support of the motion for judgment of acquittal is inconsistent with Shrader's prior statements that he neither knew the victim nor had visited Whiskey Stump.  Shrader seemed to change his version of events after he learned that the investigating officers had DNA evidence connecting him to the victim and Whiskey Stump.  This is but one of Shrader's many telling and retellings of his version of events.  Be that as it may, the panel opinion posited that the "sexual activity between them <u>could have</u> occurred well before the infliction of the fatal injuries, and there is no medical evidence to suggest that the victim suffered any sexual trauma."  41 Fla. L. Weekly at D2082.  It further dismissed evidence of "Shrader's apparent evasions about his whereabouts and not remembering the victim" as evidence of his commissions of the alleged sexual batteries.  <u>Id.</u>  Again, the panel opinion theorized, with no evidentiary support, that "Mr. Shrader <u>may have</u> chosen to give evasive answers to the investigators' questions about such topics whether or not he had committed the alleged sexual batteries."  <u>Id.</u> at D2082-83 (emphasis added).  The panel opinion went on to dismiss the fact that the victim's slain body was discovered naked from the waist down by theorizing that "the killer or killers <u>could have</u> removed her clothing after the stabbing for a variety of reasons."  <u>Id.</u> at D2083.  These are not views of the evidence in the light most favorable to the State.

As an initial matter, Shrader has maintained throughout this appeal that the special circumstantial evidence standard applies, even in light of our supreme court's Knight decision. Our supreme court has described the circumstantial evidence standard as follows: "Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt[,] a conviction cannot be sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence." Knight, 186 So. 3d at 1009 (alteration in original) (quoting Jaramillo v. State, 417 So. 2d 257, 257 (Fla. 1982)). In Knight, the supreme court

> expressly [held] that the circumstantial evidence standard of review applies only where all of the evidence of a defendant's guilt—i.e., the evidence tending to show that the defendant committed or participated in the crime—is circumstantial, not where any particular element of a crime is demonstrated exclusively by circumstantial evidence.

Id. at 1010 (emphasis added).

Firmly grounded in his position that the special circumstantial evidence standard applies, Shrader argues that because the State neglected to present sufficient evidence inconsistent with what he contends is a reasonable hypothesis of innocence, the jury's convictions for the two sexual battery charges and the felony murder charge predicated upon those sexual battery charges must be reversed. Specifically, he maintains that the State did not produce sufficient evidence inconsistent with his reasonable hypothesis of innocence that the sexual acts upon the victim were consensual and that the killing occurred sometime later. We reject his argument.

First, we note that Knight clarified that the general judgment of acquittal standard, not the special circumstantial evidence standard, applies where there is evidence tending to show that the defendant committed or participated in the crime.

Here, the State did not present wholly circumstantial evidence supporting Shrader's guilt for sexual battery with a deadly weapon or actual physical force likely to cause serious personal injury. Under the facts of this case, Shrader's DNA found inside the victim is direct evidence of Shrader's participation in the crime of sexual battery. Indeed, this is so because Shrader denied even knowing the victim, let alone having sexual contact with her. See § 794.011(1)(i), (3); Fla. Std. Jur. Instr. (Crim.) 11.2, Sexual Battery. Specifically, during Detective Fox and Special Agent Noblitt's interviews with Shrader, Shrader denied ever knowing the victim and denied ever having been to Whiskey Stump. This physical evidence is direct evidence that Shrader, at a minimum, had sexual contact with the victim, whose slain body was found at Whiskey Stump near droplets of Shrader's blood leading away from the victim's body. Cf. Lightbourne v. State, 438 So. 2d 380, 391 (Fla. 1983) (determining that "[v]iable sperm and semen traces . . . discovered in the victim's vagina indicat[ed] sexual relations at approximately the time of death" and therefore supported a finding of sexual battery); Burkell v. State, 992 So. 2d 848, 854 (Fla. 4th DCA 2008) ("Footprints and blood-DNA may operate as direct evidence for some specific issues. For example, footprints may directly establish a person was at a certain place in spite of denying ever being there. Blood-DNA analysis may settle the identity of the one contributing a specimen.").[7] Stated another way, Shrader's semen-DNA is direct evidence that he had sexual contact with the

_____

[7]In cases where the defendant did not dispute knowing the victim, unlike Shrader here, DNA evidence has been categorized as circumstantial evidence of guilt of a sexual battery. See, e.g., Caylor v. State, 78 So. 3d 482, 494 (Fla. 2011) (treating semen matching defendant's DNA that was recovered from inside deceased victim as circumstantial evidence of sexual battery where defendant did not dispute sexual encounter); Thomas v. State, 894 So. 2d 126, 133 (Fla. 2004) (same).

victim, and his blood-DNA evidence found near her deceased body is direct evidence that he was present at Whiskey Stump.[8]

A law enforcement officer discovered the victim's "warm" body on the "extremely, extremely bitterly cold" morning of January 27, 1986, in an area called Whiskey Stump. The victim was lying in the middle of a dirt road, in full view of any passerby, surrounded by blood spatters. She had been stabbed thirty-six times, was without the clothes she was wearing earlier that night, and was wearing only a yellow T-shirt. The assistant medical examiner who analyzed the victim's body opined that the victim was probably killed where her body was found. It is undisputed that semen containing Shrader's DNA was found inside of the victim's vagina and anus. It is likewise undisputed that blood found in the soil at the scene of the murder matched Shrader's DNA and that Shrader had cuts on his right hand later that morning which prevented him from giving fingerprints. The State presented testimony from an investigating officer that prior to being confronted with DNA evidence that he had sex with the victim, Shrader not only denied that he and the victim had any sexual contact but completely denied ever having met the victim or otherwise knowing who she was.

---

[8]Although we set forth the general judgment of acquittal standard in the main text of this opinion, we have set forth detailed facts in this opinion to also support affirming the trial court's denial of Shrader's motion for judgment of acquittal under the special circumstantial evidence standard. That is, even assuming for the sake of argument that the special circumstantial evidence applies, the trial court's denial of Shrader's motion for judgment of acquittal yielded no reversible error because the State presented competent evidence inconsistent with Shrader's versions of events. See McWatters v. State, 36 So. 3d 613, 633 (Fla. 2010). Indeed, we agree with the dissent that the special circumstantial evidence does not apply here. After careful review of trial evidence viewed in the light most favorable to the State, we have no pause concluding that the State presented competent evidence to rebut Shrader's hypothesis of innocence that he had consensual sex with the victim prior to her death.

Clearly, the DNA evidence left behind in his blood and semen contradicts that version of events.

Shrader's inconsistencies do not stop there. One of Shrader's then-roommates testified at trial that on the night of the murder Shrader came home with a bleeding hand. Shrader gave no fewer than three inconsistent accounts of how he cut his hand on the night of the murder. The roommate testified that Shrader first told her he had cut his fingers on a nail sticking up from a bannister outside of their apartment. On the morning after the murder, Shrader appeared in a courthouse in Hillsborough County for reasons unrelated to the murder in this case. Shrader was unable to have his right hand fingerprinted due to cuts on his pinky, ring finger, and middle finger. Later that same day, when Shrader went to have his fingers sutured at Tampa General Hospital, he informed his attending doctor that he had cut his hand while working as a roofer. After the case was reopened leading to this conviction, Shrader was interviewed by two officers from the Florida Department of Law Enforcement. In the course of the interview, Shrader told the officers that he cut his hand on a knife while reaching into a dishwasher. Shrader's then-roommate contradicted Shrader's account by testifying that Shrader never washed the dishes while they were roommates and that they did not even own a dishwasher. Indeed, whether Shrader's multiple evasions revealed a consciousness of guilt was for the jury to determine. See Straight v. State, 397 So. 2d 903, 908 (Fla. 1981) ("When a suspected person in any manner attempts to escape or evade a threatened prosecution by flight, concealment, resistance to lawful arrest, or other indications after the fact of a desire to evade prosecution, such fact is admissible,

being relevant to the <u>consciousness of guilt</u> which may be inferred . . . ."  (emphasis added)).

Taken together, the evidence more than supports the trial court's denial of Shrader's motion for judgments of acquittal.  <u>See</u> <u>McWatters v. State</u>, 36 So. 3d 613, 634 (Fla. 2010) (holding that a jury could have reasonably inferred that a murder victim did not consent to sex with defendant where disturbed dirt was found surrounding her dead body and where she had damaged undergarments; also holding that a jury could have reasonably inferred that another of the defendant's murder victims did not consent to sex with defendant where her body was found nude from the waist down, her shirt and bathing suit top were pushed up into the armpit area, her sandals were found approximately twelve feet apart from one another, and her jeans were found stained with grass or dirt); <u>Williams v. State</u>, 967 So. 2d 735, 755-56 (Fla. 2007) (holding that a jury could have reasonably inferred lack of consent to sex where police discovered the victim completely nude, found her blood-stained shorts and panties under her bed, and found bite marks on her breast and back and in the general area of her groin); <u>Fitzpatrick v. State</u>, 900 So. 2d 495, 509 (Fla. 2005) (determining evidence was sufficient to support conviction of felony murder with sexual battery as the underlying felony where a victim who had her throat slit "was found naked with her bloody undergarment wrapped around her waist near her breasts" and had suffered from a mix of other physical injuries); <u>Taylor v. State</u>, 583 So. 2d 323, 329 (Fla. 1991) (holding that extensive physical injuries suffered by victim were inconsistent with defendant's hypothesis that he briefly had consensual vaginal sex with her followed by consensual oral sex), <u>declined to follow on other grounds by</u> <u>Brown v. State</u>, 755 So. 2d 616 (Fla.

- 15 -

2000); cf. State v. Ortiz, 766 So. 2d 1137, 1142-43 (Fla. 3d DCA 2000) (determining that a prima facie case for sexual battery had been established where "victim was found beaten and virtually nude in an isolated wooded area of a park with her shirt pulled up around her head and her shorts down around her ankles").

The trial court did not err in denying Shrader's motion for judgment of acquittal. Our system of justice is based on a jury making these factual determinations, not judges. This is especially true where, as here, the disputed issue involves consent, which our court has previously held falls squarely within the province of the jury to decide. See State v. Hudson, 397 So. 2d 426, 428 (Fla. 2d DCA 1981) ("Questions of consent, force, resistance and fear are particularly within the province of the jury to determine." (emphasis added) (citing Berezovsky v. State, 335 So. 2d 592, 593 (Fla. 3d DCA 1976), rev'd in part on other grounds, 350 So. 2d 80 (Fla. 1977))). Our court has explained that because mental intent is seldom proved by direct evidence, "the absence of direct proof on the question of the defendant's mental intent should rarely, if ever, result in a judgment of acquittal." Wallace v. State, 764 So. 2d 758, 760 (Fla. 2d DCA 2000) (quoting Ehrlich v. State, 742 So. 2d 447, 450-51 (Fla. 4th DCA 1999)). The same logic applies to circumstantial evidence of a victim's consent to violent contact—particularly where the victim is unavailable to testify. See State v. Clyatt, 976 So. 2d 1182, 1184 (Fla. 5th DCA 2008) ("We see no distinction between the use of circumstantial evidence to prove state of mind in these contexts and the State's attempted use of circumstantial evidence to prove the victim's lack of consent in this battery case.").

- 16 -

Next, we reject the dissent's suggestion that lack of physical trauma to a victim's vagina or rectum implies that the victim necessarily consented to sexual activity. The assistant medical examiner testified that "there was no physical evidence of bruising, lacerations, or tearing in any of the orifices, such as the vagina or rectum." He then clarified:

> It doesn't mean that sexual battery didn't take place. It just meant that there was no physical evidence of bruising, lacerations, or tearing in any of the orifices, such as the vagina or rectum were left [sic]. And, of course, you have many people who are raped in which you don't see the evidence of this type of thing, but we didn't see that in this case.

(Emphasis added.)

The victim here falls into the latter category—those who do not show evidence of sexual trauma. Viewing the medical examiner's testimony in the light most favorable to the State, the medical examiner's testimony shows nothing more than that the victim of sexual battery here, like "many" other victims of sexual batteries, was left without bruising, lacerations, or tearing of her orifices. Our court would necessarily need to weigh the medical examiner's testimony in favor of Shrader to conclude that the sexual contact with the victim was consensual because it did not leave bruising, lacerations, or tearing of the victim's orifices. No court should weigh the evidence in such a manner when viewing the evidence in the light most favorable to the State or the jury's guilty verdict. See Fitzpatrick, 900 So. 2d at 508; Bradford, 460 So. 2d at 930 ("We are not allowed to retry a case or reweigh the conflicting evidence submitted to the jury."). The trial court followed the law and correctly denied Shrader's motion for judgment of acquittal. Cf. McKee v. State, 33 So. 2d 50, 52 (Fla. 1947) ("The trial court

- 17 -

refused to disturb the finding of the jury, and for this court to do so would amount to a substitution of our judgment for that of the jury, in an area where we would be little, if any, short of judicial meddlers."); Bradford, 460 So. 2d at 930 ("We must limit our concern to whether, after all conflicts in the evidence and all reasonable inferences derived therefrom have been resolved in favor of the verdict, there is substantial, competent evidence to support the verdict and judgment.").

Lastly, Shrader contends the trial court abused its discretion by denying his motion for mistrial based on his allegation that he was denied a fair trial because the jury had been tainted by certain jurors possibly having been briefly exposed to a newspaper article regarding Shrader. The record demonstrates that the trial court thoroughly investigated this allegation and supports the trial court's factual finding that the jury had not been tainted. Accordingly, we conclude the trial court did not abuse its discretion in denying the motion for mistrial. See England v. State, 940 So. 2d 389, 401-02 (Fla. 2006) ("A motion for a mistrial should only be granted when an error is so prejudicial as to vitiate the entire trial." (citing Snipes v. State, 733 So. 2d 1000, 1005 (Fla. 1999))).

We conclude that Shrader has not demonstrated the trial court committed any reversible error. We thus affirm his convictions and life sentences.

Affirmed.

KHOUZAM, C.J., and CASANUEVA, SILBERMAN, VILLANTI, MORRIS, BLACK, SLEET, ROTHSTEIN-YOUAKIM, and SMITH, JJ., Concur.
LaROSE and ATKINSON, JJ., Concur in result only.
LUCAS, J., Concurs with opinion in which KELLY and SALARIO, JJ., Concur.
NORTHCUTT, J., Dissents with opinion.

LUCAS, J., Concurring.

- 18 -

I concur fully with the court's decision to proceed en banc to withdraw the panel opinion in Shrader v. State, 41 Fla. L. Weekly D2080 (Fla. 2d DCA Sept. 7, 2016), withdrawn 42 Fla. L Weekly D2455b (Fla. 2d DCA Nov. 17, 2017). I also concur with the court's affirmance of Mr. Shrader's convictions and sentences. I write separately to more fully address an important point that our dissenting colleague presses. Whatever may be said of the vagaries inherent in Florida Rule of Appellate Procedure 9.331(d)(1)'s open-ended text, to my mind, the matter before us possesses all the attributes of a case of "exceptional importance," and our withdrawal of the panel's prior error is necessary "to maintain uniformity in the court's decisions." Fla. R. App. P. 9.331(d)(1).

This appeal originated from—and should have remained tethered to—the issue of whether a trial court in a felony murder trial properly denied a defendant's motion for judgment of acquittal. That legal inquiry should have formed the beginning, middle, and end of our court's review. And within that line of inquiry, once the prior panel majority acknowledged, as it did, that "[t]hese facts could suggest an inference that the sexual intercourse between Mr. Shrader and the victim was forcible and not consensual," Shrader, 41 Fla. L. Weekly at D2082, the inquiry should have ended, then and there, with an affirmance of the trial court's ruling. See Yudin v. State, 117 So. 3d 457, 459 (Fla. 2d DCA 2013) ("A defendant, in moving for a judgment of acquittal, admits not only the facts stated in the evidence adduced, but also admits every conclusion favorable to the adverse party that a jury might fairly and reasonably infer from the evidence." (quoting Lynch v. State, 293 So. 2d 44, 45 (Fla. 1974))); Dunn v. State, 206 So. 3d 802, 804 (Fla. 1st DCA 2016) ("A motion for judgment of acquittal

- 19 -

admits not only the facts in evidence, but also every reasonable inference that can be draw[n] in favor of the State from the evidence." (citing Krupkin v. State, 119 So. 3d 1267, 1270 (Fla. 1st DCA 2013))).

The prior panel, however, reversed Mr. Shrader's convictions, issuing an opinion that effectively ignored, and to some degree supplanted, many of the legal principles that are supposed to guide appellate review of motions for judgment of acquittal. For example, one would never know from the manner in which the prior opinion framed the issue on appeal[9] that a trial court, when faced with a motion for judgment of acquittal, must view the evidence before it "in the light most favorable to the State," Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002), or the admonition that "an appellate court should not retry a case or reweigh conflicting evidence submitted to a jury," Tibbs v. State, 397 So. 2d 1120, 1123 (Fla. 1981) ("[T]he concern on appeal must be whether, after all conflicts in the evidence and all reasonable inferences therefrom

---

[9]In the prior decision, the Shrader panel fashioned its task of reviewing the denial of a motion for judgment of acquittal by referencing brief and conspicuously selective principles concerning the quality of evidence needed to sustain a conviction:

> "When faced with a motion for judgment of acquittal, the trial court must measure the legal adequacy of the evidence before presenting the case to the jury for deliberation. 'Sufficient evidence is such evidence, in character, weight, or amount, as will legally justify the judicial or official action demanded.' " State v. Shearod, 992 So. 2d 900, 903 (Fla. 2d DCA 2008) (quoting Tibbs v. State, 397 So. 2d 1120, 1123 (Fla. 1981)). We review the denial of Mr. Shrader's motion for judgment of acquittal de novo. Id.

Shrader, 41 Fla. L. Weekly at D2082. Thus framed, the reader could hardly be surprised by the panel's conclusion, which deemed the evidence and its inferences insufficient to support a conviction of sexual battery and felony first-degree murder.

have been resolved in favor of the verdict on appeal, there is substantial, competent evidence to support the verdict and judgment."). Nor would a reader, upon reviewing the prior panel's majority opinion, learn that the issue of consent—the predominant issue which the panel latched upon to reverse Mr. Shrader's felony murder and sexual battery convictions—is one that is particularly reserved to the province of a jury to determine. See State v. Hudson, 397 So. 2d 426, 428 (Fla. 2d DCA 1981); State v. Clyatt, 976 So. 2d 1182, 1184 (Fla. 5th DCA 2008). I do not believe for a moment that the prior panel's omission of these bedrock principles concerning judgments of acquittal could remain unnoticed among the trial courts. And that is precisely why this court needed to proceed en banc to withdraw that prior panel decision.

The withdrawn opinion constituted a subtle, but palpable, change in the law. Admittedly, it was not explicit.[10] But by selectively omitting settled legal principles on motions for judgment of acquittal, and through the fiat of an extensive rendering of graphic facts followed by an exposition of theoretical explanations for that evidence, the prior Shrader panel effectively grafted into the law an appreciably different standard of appellate review for cases such as Mr. Shrader's. If the evidence presented in Mr. Shrader's cold case prosecution—where a half-naked, repeatedly stabbed, still warm body of a victim bearing defensive wounds was discovered with a defendant's semen and blood within and around her, and that same defendant, bearing a recently inflicted

---

[10]It need not be. An appellate opinion can machinate evolution into the common law in all sorts of ways, some of them blunt, many of them discrete. See Jack G. Day, Why Judges Must Make Law, 26 Case W. Res. L. Rev. 563, 565, 591 (1976) (observing that "[j]udicial lawmaking can be obvious or subtle. At the appellate level overruling a precedent, fashioning a new rule or extending an old one to reach a novel issue is patent law-shaping" but that "even the law emerging from the application of an existing rule may alter the contours of the precedent").

wound of his own, denied having ever known that victim—in short, if a record like the one before us does not form a sufficient constellation of facts that, *when viewed in the light most favorable to the State*, no reasonable jury could conclude guilt of sexual battery and felony murder, then what do pronouncements about "reasonable juries," or "substantial, competent evidence," or indeed, the basic deference we are supposed to afford to the province of the fact-finder still mean in operation?

Answers to those queries will not be found in the omissions of the prior opinion, but they become apparent in that opinion's speculations.  For while the Shrader panel left the guiding principles of its analysis unstated, from the manner in which its analysis proceeded, it is clear that the prior panel majority preferred an alternative legal standard to resolve this case (and one does not have to delve very deep to discern what it was): the circumstantial evidence standard this court applied prior to the Florida Supreme Court's clarification of that standard in Knight v. State, 186 So. 3d 1005 (Fla. 2016).  See P.M.M. v. State, 884 So. 2d 418 (Fla. 2d DCA 2004); N.K.W., Jr. v. State, 788 So. 2d 1036 (Fla. 2d DCA 2001); S.B. v. State, 657 So. 2d 1252 (Fla. 2d DCA 1995).  Without ever citing the circumstantial evidence standard[11] the prior Shrader opinion posited:

> In the case before us, there is no evidence of the timing of the sexual intercourse between the victim and Mr. Shrader.  The sexual activity between them could have

---

[11]The terms "circumstantial evidence," "special standard," or "reasonable hypothesis of innocence" are nowhere to be found in the prior panel opinion.  Which is a particularly curious omission, since, the dissent now informs us, the prior panel majority "initially determined that Shrader's felony murder and underlying sexual battery convictions could not stand because the State's circumstantial evidence was not inconsistent with the reasonable possibility that Shrader and the victim had consensual sex sometime in the hours before her death."  It seems the circumstantial evidence test can be an animating principle even in cases where it is not mentioned.

occurred well before the infliction of the fatal injuries, and there is no medical evidence to suggest that the victim suffered any sexual trauma. Instead, the medical evidence was inconclusive regarding the use of force in connection with the sexual encounter that had occurred. It is entirely possible, based upon the evidence presented, that Mr. Shrader and the victim had consensual sexual intercourse and she was killed subsequently for reasons unknown. Granted, the victim's clothing was gone, but we do not know what became of it or why the victim was partially nude when her body was found.

The State points to the evidence of Mr. Shrader's apparent evasions about his whereabouts and not remembering the victim as evidence of his commission of the alleged sexual batteries. However, Mr. Shrader may have chosen to give evasive answers to the investigators' questions about such topics whether or not he had committed the alleged sexual batteries. And as far as the body's state of undress, one can do no more than speculate about the reason for that. It is even possible that the victim was fully clothed when she was stabbed to death. The killer or killers could have removed her clothing after the stabbing for a variety of reasons.

Shrader, 41 Fla. L. Weekly at D2082-83.

"One can do no more than speculate," indeed. What could any judge or lawyer conclude from this opinion but that the State must either present direct evidence as to each element of sexual battery—including the victim's lack of consent and the threat of force—or disprove every reasonable hypothesis of the defendant's innocence? Raising hypotheses and speculations was the sum and substance of the entire holding.[12]

_____

[12]I will pause here to address another aspect of the prior panel majority's consideration of this appeal that our dissenting colleague discusses in his opinion: a second panel opinion that had circulated among the court on rehearing but was never issued because of the court's decision to proceed en banc. The dissent claims that "the panel majority's rehearing opinion, although reaching the same result, differed vastly from its published predecessor" by applying a "very different standard of review" and "a much more detailed examination of the trial." The implication is, according to the

- 23 -

And so, too, runs the dissent's analysis today, an analysis that even now—despite repeated acknowledgments and repeated professions such as, "the panel majority on rehearing applied Knight in Shrader's case and declined to apply the special circumstantial evidence standard on review"—proceeds in lockstep with the pre-Knight circumstantial evidence test. What the dissent and the prior panel majority espouse is nothing but *a circumstantial evidence test cast in the guise of a sufficiency of the evidence analysis*. For proof, one need look no further than the way our colleague presents his recitation of the evidence.

Toward the end of his opinion, the dissent acknowledges that the victim probably died shortly before her body was found, half-naked, repeatedly stabbed, still steaming in the cold air, at Whiskey Stump. And the dissent admits that the medical examiner testified that the amount of the victim's blood found at the scene led the examiner to believe that the victim was attacked at that spot. Ah, but the examiner equivocated on that point, the dissent goes on to note (repeating the same line of the examiner's testimony twice, for effect). Our colleague concedes that "[t]he medical

_____

dissent, that if this second opinion had issued, it would be clear that the panel was not really applying the special circumstantial evidence standard, obviating the need to proceed en banc. Putting aside the majority's justified concern about revealing internal communications of the court, the reader will not be surprised to learn that within the very thorough and detailed dissenting opinion, an adequate surrogate for this never-issued opinion has effectively been provided. And in point of fact, as I have mentioned already, the first panel majority opinion that was issued never discussed, much less held, that the circumstantial evidence test should apply in this case. Regardless, whether the panel majority chose to leave the circumstantial evidence standard unmentioned (as in the first opinion) or expressly disavowed it (as, ostensibly, it did in the second), it is a point of complete irrelevance because all of these opinions—the panel opinion that issued, the subsequent panel opinion that did not, and the dissenting opinion today— are all the same in substance. Like the withdrawn opinion, and just like today's dissenting opinion, this second, unissued opinion was nothing but a circumstantial evidence analysis machinated to resemble a sufficiency of the evidence analysis.

examiner testified that there were defensive wounds on the victim's arm and hand, and that the pattern of her stab wounds was consistent with someone moving and trying to fend off an attack." But wait. The dissent notes that none of the people who were camping near where the victim's body was found testified that they heard any shouts or other signs of an attack.[13] And although both the victim's and Mr. Shrader's blood were found in soil samples at the scene, the dissent points out that the assailant might have cut himself before arriving at the scene, so that the victim could have been killed elsewhere before her body was dumped at Whiskey Stump.[14] The dissenting opinion labors on like this for quite some time; to good effect, if one wishes to see what a portrait of exculpatory explanations painted over the State's case might look like.

But that is not an endeavor an appellate court can undertake when reviewing an ordinary motion for judgment of acquittal, where the evidence is supposed to be considered "in the light most favorable to the State." See Pagan, 830

---

[13]I believe the point the dissent is making here is that if the victim had been sexually assaulted at Whiskey Stump, one of these nearby campers would surely have heard a commotion and reported it to investigators—a hypothesis along the line of Arthur Conan Doyle's "dog that didn't bark" motif.

[14]In certain places the speculation turns into outright factfinding, such as the dissent's claim that the "absence of any appreciable amount of seminal fluid within the victim also demonstrated that even if the homicide took place where her body was found, the sex did not." That conclusion does not at all match the forensic pathologist's testimony, who said only that "the amount of acid phosphatase [found in the victim] was not enough to ascertain that ejaculation took place; but, nonetheless, there was enough to say that . . . this fluid was there. And, of course, we see that all of the time." The "absence of any appreciable amount of seminal fluid" is just as easily explained by the fact that a perpetrator can sexually batter a victim without fully ejaculating (or ejaculating at all) into a victim. Cf. Andrea Roth, Defying DNA: Rethinking the Role of the Jury in an Age of Scientific Proof of Innocence, 93 B.U. L. Rev. 1643, 1675 (2013) ("[I]n a case in which no DNA was recovered from a sample from a rape kit, the reality could be that the perpetrator used a condom or did not ejaculate."). But that is a point the dissent has not deigned to consider.

So. 2d at 803; Starks v. State, 223 So. 3d 1045, 1048-49, 1052 (Fla. 2d DCA 2017) (affirming conviction of second-degree murder and holding that "[i]f, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction" (quoting Pagan, 830 So. 2d at 803)); Yudin, 117 So. 3d at 460 (same); Vasquez v. State, 111 So. 3d 273, 275-76 (Fla. 2d DCA 2013 (Fla. 2d DCA 2013) (same); Evans v. State, 26 So. 3d 85, 88, 91 (Fla. 2d DCA 2010) (same).  Why, then, is the dissent, like the prior panel, searching for possible shortcomings within every piece of the State's evidence at every turn?  If that exercise is not, as the dissent protests, a reweighing of the evidence, what is it?

The answer is simple.  This victim (who, the dissent reminds us, had last been seen "hopping from bar to bar, asking patrons for rides") *might have had consensual sex* with Mr. Shrader sometime before she was killed.  Which is to say— and there is no other way of saying this, because there is no avoiding what it is—our colleague has latched upon a reasonable hypothesis of innocence for Mr. Shrader on the charge of sexual battery.

The problem, of course, is that Mr. Shrader's was not a circumstantial evidence case.  Treating it as one by engaging in alternative explanations for the evidence obfuscates the clarity the Florida Supreme Court provided in Knight in an area of the law where clarity on legal standards holds a particular premium.  Cf. Dunn v. State, 454 So. 2d 641, 642 (Fla. 5th DCA 1984) (Cowart, J., concurring specially) ("This case involves one of the most difficult questions regularly presented to the criminal trial judge: What is the difference between the sufficiency and the weight of the evidence

- 26 -

and, more particularly, what is the rule of law on a motion for a judgment of acquittal in a circumstantial evidence case and how should that rule be applied?").

It is not, then (as has been suggested), mere disagreement with the prior panel's resolution in Shrader that necessitated this rehearing en banc. This is a case of exceptional importance because altering the standard of review an appellate court implements in a criminal appeal is an exceptionally important issue. Moreover, the prior panel's resolution of this case inescapably conflicted with this court's standard of review for motions of judgment of acquittal as recited in Starks, Yudin, Evans, and Vasquez, cases that faithfully applied the Florida Supreme Court's standard of review in Pagan. Were we to allow the prior panel opinion to stand, the trial courts within our district would be forced to either (i) willfully ignore Shrader, a published opinion of this court, as precedent; (ii) somehow reconcile our irreconcilable application of facts within the commonly understood meaning of settled law on motions for judgment of acquittal; or (iii) begin reapplying what is, in effect, a circumstantial evidence standard to motions for judgment of acquittal, even in cases where the proof of guilt is not wholly circumstantial. Accord Knight, 186 So. 3d at 1010. Given the frequency with which our trial courts must address motions for judgment of acquittal, any change in the controlling legal standard is no trifling matter. Rule 9.331(d)(1) allows this court to circumvent the change in the law the prior panel opinion would have necessarily foisted. In my view, the court had ample justification to consider this case en banc, and for that reason I concur with the majority's en banc decision today.

KELLY and SALARIO, JJ., Concur.

NORTHCUTT, J., Dissenting.

The majority opinion is premised on significant inaccuracies: It misstates the history of this case by overlooking the panel's opinion on rehearing, then it mischaracterizes the panel's initial published opinion. Further, its position on the propriety of Shrader's convictions relies on a significant and materially mistaken recitation of the evidence.

Worst of all, the majority advances a dangerously expansive notion of the court's en banc authority, premised on mere legal error. The resulting opinion invokes the en banc process not to harmonize this court's decisions or to decide an issue or case of exceptional importance, but merely to overrule the panel majority's opinion in the case. That opinion has no legal viability in any event, and it cannot form the basis of any decision. For that reason alone, the court should refrain from disposing of the case en banc.

I.    **The majority opinion assails the initial panel decision while failing to discuss the panel's opinion on rehearing, which appropriately applied the customary noncircumstantial evidence standard of review.**

The majority opinion criticizes the September 2016 panel decision, which by a split vote reversed Shrader's convictions for first-degree felony murder and sexual battery and remanded for a new trial for second-degree murder. Shrader v. State, 41 Fla. L. Weekly D2080 (Fla. 2d DCA Sept. 7, 2016), withdrawn 42 Fla. L. Weekly D2455b (Fla. 2d DCA Nov. 17, 2017). But the majority does not mention that the panel circulated a different opinion on rehearing. The latter fact provides necessary context for the majority's observations that "Shrader has maintained throughout this appeal that the special circumstantial evidence standard applies, even in light of our supreme

- 28 -

court's Knight[15] decision" and that Shrader is "[f]irmly grounded in his position that the special circumstantial evidence standard applies."

In fact, everyone involved in the initial panel disposition—Shrader, the State, the panel majority, and the panel dissenter—accepted that the special standard of review in circumstantial evidence cases applied. This was because Shrader's trial and the briefing in this appeal predated the supreme court's clarification of the special standard of review in Knight, and neither party submitted a notice of supplemental authority citing Knight when it was issued.[16]

The panel majority initially determined that Shrader's felony murder and underlying sexual battery convictions could not stand because the State's circumstantial evidence was not inconsistent with the reasonable possibility that Shrader and the victim had consensual sex sometime in the hours before her death. See Jaramillo v. State, 417 So. 2d 257, 257 (Fla. 1982) ("Where the only proof of guilt is circumstantial, no matter how strongly the evidence may suggest guilt[,] a conviction cannot be

---

[15]Knight v. State, 186 So. 3d 1005 (Fla. 2016).

[16]The en banc majority notes that the dissenter from the initial panel decision "cited the supreme court's opinion approving the Fifth District Court of Appeal's decision in Knight v. State, 107 So. 3d 449 (Fla. 5th DCA 2013), approved, 186 So. 3d 1005 (Fla. 2016)," perhaps giving the impression that he argued against employing the circumstantial evidence rule in Shrader's case. He did not. Rather, he relied on the Fifth District's Knight decision simply for its observation that "the stronger the circumstantial evidence, the more likely that a rational jury will be justified in rejecting explanations other than the guilt of the accused as unreasonable." Shrader, 41 Fla. L. Weekly at D2085 (Badalamenti, J., concurring in part and dissenting in part) (quoting Knight, 107 So. 3d at 458). Other than in the context of that comment on the weight of the evidence, Knight was not mentioned; most of the dissent described why its author felt that the conviction should be affirmed even under the special circumstantial evidence standard of review.

sustained unless the evidence is inconsistent with any reasonable hypothesis of innocence."  (quoting McArthur v. State, 351 So. 2d 972, 976 n.12 (Fla. 1977))).

However, in Knight the supreme court clarified the special circumstantial evidence standard of review and narrowed its application to cases in which the evidence pointing to the identity of the perpetrator of the charged offense is wholly circumstantial.  186 So. 3d at 1010.  The State filed a motion for rehearing or rehearing en banc in which it cited Knight and argued for the first time that the circumstantial evidence standard of review did not apply to this case.  The panel granted the rehearing motion and ordered supplemental briefs addressing Knight's application to Shrader's case.

As the majority points out, in his supplemental brief Shrader contended that the special circumstantial evidence standard of review applied to his case even after Knight.  Specifically, he maintained that the DNA evidence identifying him as the person whose seminal fluid was found inside the victim's body and whose blood was found in soil taken from its immediate vicinity was circumstantial.  This position had ample support in case law; Shrader cited decisions in which DNA evidence was deemed to be circumstantial.  See Dausch v. State, 141 So. 3d 513, 518 (Fla. 2014); Miller v. State, 107 So. 3d 498, 501 (Fla. 2d DCA 2013).  And, in fact, the dissenter from the initial panel decision had acknowledged that "[i]n most cases, courts classify DNA evidence as circumstantial evidence."  41 Fla. L. Weekly at D2083 (Badalamenti, J., concurring in part and dissenting in part).

After the supplemental briefing, the panel prepared and circulated revised majority and dissenting opinions.  In its opinion on rehearing, the panel majority

acknowledged that the treatment of DNA evidence as direct or as circumstantial varies according to the specifics of particular cases.  In the instant case, the panel majority disagreed with Shrader's position and concluded that the DNA matches were direct evidence of his identity as the perpetrator.  This was because the DNA matches did not require any additional evidence or inference to establish one of the elements necessary to prove the sexual battery charges, i.e., that Shrader was the person whose penis had penetrated the vagina and anus of the victim.  See, e.g., Fitzpatrick v. State, 900 So. 2d 495, 507–08 (Fla. 2005); Thorp v. State, 777 So. 2d 385, 394 (Fla. 2000); Orme, 677 So. 2d 258, 262 (Fla. 1996); see also Burkell v. State, 992 So. 2d 848, 854 (Fla. 4th DCA 2008) (Farmer, J., dissenting) ("Blood-DNA analysis may settle the identity of the one contributing a specimen.").  Still, after carefully examining the trial record and analyzing the evidence in exacting detail under the noncircumstantial evidence standard of review, the panel majority concluded that the State failed to carry its burden to prove every element of the sexual battery charges beyond a reasonable doubt, and therefore it failed to prove felony murder.

Thus, just as the en banc majority does today, the panel majority on rehearing applied Knight in Shrader's case and declined to apply the special circumstantial evidence standard of review.  In other words, on this issue the en banc and panel majorities are in complete agreement.  Beyond that, all of the en banc majority's criticisms of the panel majority's decision are directed to the initial opinion that the panel majority abandoned on rehearing.

The majority "find[s] it inappropriate" to discuss "decision-making communications" of the court.  To be sure, my fuller description of the internal history of

this case is not typical protocol. But I have found no authority prohibiting such; to the contrary, there is precedent for it. See, e.g., Childers v. State, 936 So. 2d 619, 620 (Fla. 1st DCA 2006) (en banc) (on motion for certification); Fleischer v. Hi-Rise Homes, Inc., 536 So. 2d 1101, 1102 (Fla. 4th DCA 1988) (en banc) (Glickstein, J., dissenting). Still, I understand the majority's reticence in this regard. As a general matter, I endorse it; certainly, disclosing prior internal discussions, emails, memoranda, or other communications should be avoided insofar as the prospect of such disclosures might tend to inhibit debate and the free exchange of ideas that are necessary to the deliberative process.

But that cannot be said of the panel's opinion on rehearing, which was the end of the panel's deliberations. The resulting majority and dissenting opinions had been finalized; they had been incorporated in a unified document that was physically signed by the panel judges and delivered to the clerk for publication; the clerk's office had assigned a publication date for the opinion, and in accordance with the court's published internal operating procedures, the clerk's office had circulated an advance copy of the opinion to all judges and staff of the court. At that point, the panel's deliberations were complete. Discussing the existence and general substance of their finalized opinion on rehearing reveals only what the panel judges intended for public consumption when written, signed, and delivered to the clerk. It poses no danger that free-flowing deliberative processes will be inhibited in the future.

On the other side of the equation is rule 9.331, which as will be discussed later in this opinion, permits en banc dispositions only when necessary to maintain uniformity in the court's decisions or to decide cases or issues of exceptional

- 32 -

importance.  It is significant, then, that the panel majority's rehearing opinion, although reaching the same result, differed vastly from its published predecessor.  It applied a very different standard of review that required a much more detailed examination of the trial—to determine not merely whether the State's evidence failed to contradict any reasonable hypothesis of innocence on any element of a charge, but instead to discern whether the State's proof was legally sufficient to affirmatively prove every element of every charge, and if not, to explain why.  Surely, that opinion is critically germane to the assessment of whether en banc disposition of this case is necessary and therefore permissible under the dictates of rule 9.331.  It is difficult to fathom how we can overlook it.

II.     **Both initially and on rehearing, the panel correctly reviewed the evidence for legal sufficiency under applicable standards of review.**

In Baker v. State, 959 So. 2d 1250 (Fla. 2d DCA 2007), Judge Casanueva authored on behalf of a panel of this court an opinion reversing Baker's felony battery conviction.  Baker was proved to have bitten his then-girlfriend, but the panel reviewed the record of the jury trial and determined that the State nevertheless had failed to present evidence sufficient to prove the crime of battery under section 784.03(1)(a), Florida Statutes (2005).  Id. at 1251.

> Judge Casanueva wrote:
>
> For the State to overcome a defense motion for judgment of acquittal, the State had to present prima facie evidence that Mr. Baker intentionally bit the victim and this biting was against her will, or that Mr. Baker intended to harm her. Here, the State presented prima facie evidence only that Mr. Baker was the perpetrator.  The State failed to present any evidence that the alleged touching—the bite—was intentional and against the victim's will.

Id. at 1251–52 (citations omitted).

Judge Casanueva noted that the trial court's denial of Baker's motion for judgment of acquittal was to be reviewed de novo, pursuant to Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002). Id. at 1251. When concluding that the trial court should have granted the acquittal, the Baker panel applied established law holding that

> the prosecution, in order to present a prima facie case, is required to prove each and every element of the offense charged beyond a reasonable doubt, and when the prosecution fails to meet this burden, the case should not be submitted to the jury, and a judgment of acquittal should be granted.

Id. (quoting Baugh v. State, 961 So. 2d 198, 203–04 (Fla. 2007)).

Similarly, in Wright v. State, 221 So. 3d 512 (Fla. 2017), the Florida Supreme Court unanimously reversed Wright's jury conviction on two counts of first-degree murder. Id. at 513. The victims were a former girlfriend of Wright's and her fifteen-month-old child. Id. at 514. Because the evidence pointing to Wright as the perpetrator was wholly circumstantial, the court applied the special circumstantial evidence standard of review, i.e., "not only must the evidence be sufficient to establish each element of the offense," it must also "be inconsistent with any reasonable hypothesis of innocence proposed by the defendant." Id. at 521 (quoting Twilegar v. State, 42 So. 3d 177, 188 (Fla. 2010)).

In a per curiam opinion that reviewed and analyzed the record in careful detail, the court held that the evidence was legally insufficient to prove the charges. "Although the jury is the trier of fact," the court wrote, "a conviction of guilt must be reversed on appeal if it is not supported by competent, substantial evidence." Id. at 521 (quoting Ballard v. State, 923 So. 2d 475, 482 (Fla. 2006)).

Notably, in Wright, the evidence at trial showed that when first questioned by the investigating detective about his relationship with the victim, i.e., before the detective told Wright that she and her child had been murdered, Wright declared that she was a "thorn in [his] side" because she had been claiming that he had fathered her child even though they had never had sex. Id. at 516. The latter was disproved by DNA evidence confirming that Wright was the child's father. Id. at 517.

It is also notable that in a concurring opinion joined by a majority of justices, Justice Canady wrote that Wright's conviction could not have been sustained even without the special circumstantial evidence standard of review:

> Even absent the reasonable-hypothesis-of-innocence special standard of review that is applied in cases in which the evidence of guilt is wholly circumstantial, I would conclude that the evidence presented at Wright's trial is insufficient to sustain his convictions under the standard of review that otherwise applies. See Pagan v. State, 830 So. 2d 792, 803 (Fla. 2002) ("If, after viewing the evidence in the light most favorable to the State, a rational trier of fact could find the existence of the elements of the crime beyond a reasonable doubt, sufficient evidence exists to sustain a conviction."). Here, no rational trier of fact could have found the existence of all the elements necessary to prove Wright guilty of the murders—specifically, the identity element— beyond a reasonable doubt.

Id. at 525–26 (Canady, J., concurring).

I describe these precedents because they exemplify the processes by which the two standards of review were employed by the panel majority in the instant case, one when the panel applied the special circumstantial evidence standard of review and the other in its later opinion on rehearing when it applied the "nonspecial" standard of review. In both instances the panel carefully examined and analyzed the record to determine whether the State had met its burden to prove all elements of the

- 35 -

charged crimes beyond a reasonable doubt.  And in both instances the panel discerned that the evidence was insufficient to prove sexual battery and, therefore, felony murder. The panel did not reweigh the evidence or substitute its judgment for that of the jury, as the en banc majority contends, just as the supreme court did not do so in Wright and just as this court did not do so in Baker.

The en banc majority's assertion to the contrary—because "[t]he panel opinion failed to explain that our de novo review must yield an affirmance of a conviction if it is supported by competent, substantial evidence"—is simply wrong.  In its initial opinion, the panel majority made clear that it undertook to determine whether the State presented legally sufficient evidence to support the conviction.  It quoted this court's decision in State v. Shearod, 992 So. 2d 900, 903 (Fla. 2d DCA 2008) (emphases supplied) (quoting Tibbs v. State, 397 So. 2d 1120, 1123 (Fla.1981)): "When faced with a motion for judgment of acquittal, the trial court must measure the legal adequacy of the evidence before presenting the case to the jury for deliberation.  'Sufficient evidence is such evidence, in character, weight, or amount, as will legally justify the judicial or official action demanded.' "  Shrader, 41 Fla. L. Weekly at D2082.  In contrast, Shearod noted, the weight of the evidence "is a determination of the trier of fact that a greater amount of credible evidence supports one side of an issue or cause than the other." 992 So. 2d at 904 (quoting Tibbs, 397 So. 2d at 1123).[17]

Neither is it true, as asserted by today's majority, that the panel "usurped

----

[17]It was the panel dissenter, not the majority, who contended that we, as the reviewing court, should weigh the evidence: "I do not believe it is sufficient to classify evidence as 'circumstantial' without also considering its relative strength." Shrader, 41 Fla. L. Weekly at D2805 (Badalamenti, J., concurring in part and dissenting in part).

the jury's role to determine issues of consent."  The majority relies on State v. Hudson, 397 So. 2d 426, 428 (Fla. 2d DCA 1981), for the proposition that "[q]uestions of consent, force, resistance and fear are particularly within the province of the jury to determine."  But Hudson was hardly a meaningful test of that proposition for our purposes.  In that sexual battery prosecution, the victim testified that the defendant grabbed her, tried to pull off her swimsuit, dragged her behind a parked car, and repeatedly threatened to hurt her if she did not submit to him.  Id. at 427–28.  The court reversed the lower court's pretrial dismissal of the charge because, this court held, a jury could find that her capitulation was against her will.  Id. at 428.

Hudson did not hold that the State's burden of proof is in any way lessened on issues of consent.  No case holds as much.  Before any charge is submitted to the jury, the State must prove prima facie every element of it beyond a reasonable doubt.  Only when it has done so does the charged crime or any element thereof become the province of the jury; failing such proof, the court must order the defendant's acquittal.  See Wright, 221 So. 3d 512; Baugh v. State, 961 So. 2d 198 (Fla. 2007); Pagan, 830 So. 2d 792; Williams v. State, 560 So. 2d 1304, 1306 (Fla. 1st DCA 1990).  As evinced by Judge Casanueva's opinion in Baker, 959 So. 2d at 1251–52, there is no exception for issues of consent.

One puzzling feature of the en banc majority's opinion is its assertion that the panel majority "attempted to provide contrived examples as to how the evidence 'could have' boded in favor of Shrader's attorney's argument in support of the motion for judgments of acquittal," thus couching the evidence in the light most favorable to Shrader.  This criticism is based on an inaccurate premise that stems from the

majority's failure to acknowledge the panel's opinion on rehearing, in which the panel applied the noncircumstantial evidence standard of review. The majority proceeds here as if the panel initially applied that standard of review but committed errors when doing so. Recall, however, that the motion for judgment of acquittal at Shrader's trial was based on the circumstantial evidence rule that prevailed during the trial and throughout his appeal until the State's motion for rehearing.

The "could haves" to which the en banc majority takes offense were legitimate hypotheses of innocence that were applied to the evidence under the circumstantial evidence standard of review. As the supreme court observed in Wright, 221 So. 3d at 521, under that standard a conviction must be reversed if the State's evidence is not inconsistent with any reasonable hypothesis of innocence by the defendant, i.e., so-called "could haves." See, e.g., Ballard, 923 So. 2d at 484 (reversing murder convictions based on circumstantial evidence: State's theory was that Ballard's hair, found in hand of murder victim, was deposited during fatal attack, but "[i]t is just as likely that it fell out any time Ballard was casually in the room, or it could have been transferred to the room from any other part of the apartment which Ballard was known to frequent." (Emphasis supplied)); Miller v. State, 107 So. 3d 498, 502 (Fla. 2d DCA 2013) (reversing conviction for felon in possession of firearm based on circumstantial evidence, including expert testimony naming defendant as the "major contributor" of fingerprints on handgun: "[S]omeone could have touched the gun after the 'major contributor' and simply left no detectable DNA." (Emphasis supplied)); Chaudoin v. State, 362 So. 2d 398, 402 (Fla. 2d DCA 1978) (reversing murder conviction based on circumstantial evidence: When defendant was seen running away after the victim was

- 38 -

shot "he could have been fleeing the scene to avoid any participation in the shooting." (Emphasis supplied)); Garcia v. State, 227 So. 2d 209, 210 (Fla. 2d DCA 1969) (reversing conviction for breaking and entering an automobile based on circumstantial evidence: "Garcia could have had possession of [the victim's apartment key] in innumerable ways, perfectly legitimate.  It did not necessarily mean that he acquired it by breaking into her automobile a week before at a place forty miles away."  (Emphasis supplied)).

The panel majority opinions in this case were not erroneous under the standards of review applied in them.  The panel majority did not reweigh the evidence, did not substitute its judgment for the jury's, did not improperly view the evidence in the light most favorable to the defendant, and did not otherwise deviate from the applicable law of this district or the supreme court.  To the contrary, as reflected above, the panel majority properly conformed to well-established precedents.  By mischaracterizing the panel majority's initial opinion, and by ignoring the opinion on rehearing circulated by the panel while incorrectly attributing the standard of review applied in that opinion to the panel's initial opinion, the en banc majority conceives a basis for en banc rehearing where none, in fact, exists.  It hardly needs to be said that this is a dangerous, destructive course.

## III.     There is no permissible basis for en banc rehearing in this case.

As amended in 1972, the Florida Constitution specifies that in district courts of appeal "[t]hree judges shall consider each case and the concurrence of two shall be necessary to a decision."  Art. V, § 4(a), Fla. Const.  In 1979, on the recommendation of the Florida Appellate Structure Commission, the supreme court

devised a rule permitting cases to be decided en banc. <u>In re Florida Rules of Appellate Procedure</u>, 374 So. 2d 992 (Fla. 1979); <u>see also</u> Fla. R. App. P. 9.331. At the time, the court acknowledged that the new procedure arguably was at odds with the constitution, but it agreed with the commission that a rigid construction of article V, section 4(a) was not required and that en banc proceedings in the district courts would be beneficial to the appellate structure of the state. <u>In re Florida Rules of Appellate Procedure</u>, 374 So. 2d at 993.[18]

At first, en banc review was permitted only when necessary to maintain uniformity among a court's decisions. <u>Id.</u> at 993–94; <u>In re Rule 9.331, Determination of Causes by a District Court of Appeal En Banc, Florida Rules of Appellate Procedure</u>, 377 So. 2d 700, 701 (Fla. 1979). Five years later, the supreme court expanded the rule to also permit en banc consideration when a "case is of exceptional importance." <u>The Florida Bar Re: Rules of Appellate Procedure</u>, 463 So. 2d 1114, 1120 (Fla. 1984). In

---

[18]This reasoning was certainly debatable. The Appellate Structure Commission relied on a 1961 memorandum of law by a former district court of appeal judge who concluded that "this constitutional provision sets only a minimum standard and does not prohibit en banc review by district courts of appeal." <u>In re Florida Rules of Appellate Procedure</u>, 374 So. 2d 992, 993 (Fla. 1979). Significantly, neither the commission nor the supreme court acknowledged that when that memorandum was written in 1961 the constitution's language governing district court decision-making differed markedly from the 1979 version in effect when the en banc rule was promulgated. Unlike the 1979 version, in 1961 the constitution did not specify that a concurrence of "two" judges was necessary to a decision; rather, it provided merely that a "majority" vote was required. Art. V, § 5(2), Const. of 1885, as amended in 1960. Prior to the 1960 amendment, this section required that "[n]ot less than three judges shall consider each case and the concurrence of a majority shall be necessary to a decision." Art. V, § 5(2), Const. of 1885, as revised in 1956. By the time the supreme court adopted the en banc rule in 1979, the language prescribing how district courts of appeal must consider and decide each case had been amended to be far more specific and restrictive—rigid, as the supreme court put it—and it remains so today: "the concurrence of <u>two</u> shall be necessary to a decision."

- 40 -

2014 the rule was again amended to provide that a party may request an en banc rehearing to decide a case "or issue" that is of exceptional importance. In re Amendments to the Florida Rules of Appellate Procedure, 183 So. 3d 245, 262 (Fla. 2014). The authority of a district court itself to initiate an en banc proceeding to resolve an issue of exceptional importance was added only recently, effective January 1, 2019. In re Amendments to Florida Rules of Appellate Procedure—2017 Regular-Cycle Report, 256 So. 3d 1218, 1275 (Fla. 2018).

As befits the en banc rule's rather fuzzy constitutionality, throughout the history of the rule the supreme court has taken pains to emphasize that the authority of district courts to sit en banc is strictly circumscribed. From the beginning, the rule has included an express admonition that "[e]n banc hearings and rehearings shall not be ordered unless" the above-described grounds are present. Fla. R. App. P. 9.331(a) (emphasis supplied). From the beginning, the rule has mandated that a party's motion for rehearing en banc based on any other ground "shall be stricken." Fla. R. App. P. 9.331(d)(1) (emphasis supplied). From the beginning, the court commentary published with the rule has underscored the very narrow scope of a district court's en banc authority: "Counsel are reminded that en banc proceedings are extraordinary and will be ordered only in the enumerated circumstance[s]." In re Florida Rules of Appellate Procedure, 374 So. 2d at 994 (emphases supplied).

As previously shown, the panel decisions in this case did not conflict with any decision of this court. To the contrary, they were fully consistent with the law of this district. There simply is no basis for rehearing the case en banc to maintain uniformity among this court's decision.

Neither can it be said that Shrader's is a case of any particular jurisprudential significance or that it presents any issue of exceptional importance. He was accused and convicted of killing the victim while committing or attempting to commit sexual batteries upon her. The primary issue on appeal is the sufficiency of the evidence to support the convictions. It is unfortunate but true that such cases are not uncommon; the majority's opinion alone cites five of them. Legally, there is nothing especially distinctive about this one.

The majority's assertion that a case is rendered of exceptional importance by the "panel opinion's failure to follow both supreme court and our court's law"—in other words, by a mere legal error—contravenes the very narrow strictures set forth in the en banc rule. It violates the admonitions emphasized time and again by the supreme court every time it has visited the rule. And even if the majority's mistaken view of this court's en banc authority were accurate, it would have no application in this case because the panel's decisions fully comported with the law.

As the en banc rule and accompanying commentary make clear, it makes no difference that a majority of the court's judges disagree with the panel's decision. En banc consideration is not simply another step in the appellate process, and it is not the place of the court as a whole to review the work of a panel. See Fla. R. App. P. 9.331 and commentary; Clausell v. State, 455 So. 2d 1050, 1057 (Fla. 3d DCA 1984) (Hubbart, J., concurring) (recognizing the reprehensible consequences of allowing en banc review to overrule a prior panel decision based on a disagreement with the panel majority's result or reasoning), panel opinion approved, en banc decision quashed, 474 So. 2d 1189 (Fla. 1985). Three-judge panels have the "right to be wrong," and it is

- 42 -

beyond the purview of the court to convene en banc simply in order to correct mere legal error in the panel's result. See, e.g., State v. Georgoudiou, 560 So. 2d 1241, 1247–48 (Fla. 5th DCA 1990) (Cowart, J., dissenting); Marr v. State, 470 So. 2d 703, 712 (Fla. 1st DCA 1985) (Smith, J., specially concurring); id. at 715–17 (Ervin, C.J., dissenting).

The bottom line is that there is no permissible basis for this departure from the constitution's "concurrence of two" directive, and therefore the en banc majority is acting well outside the parameters of rule 9.331.

That said, even crediting the majority's view that it may intercede en banc to correct a panel's mere error, it is impossible to read rule 9.331 and its associated commentary without appreciating that en banc disposition is meant to be employed sparingly. In this case there is an additional, procedurally unusual reason why the court should refrain from doing so: there is nothing to be gained by it for any purpose contemplated in the rule.

I have previously alluded to the fact the en banc majority is exclusively concerned with the panel's initially published opinion when, in fact, the panel majority's last word in this case was its opinion on rehearing. This was meant to be accompanied by an order withdrawing the initial opinion, which had been released bearing the admonition that it was "NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED." As we know, that panel ruling on rehearing was never released because the court as a whole intervened with an order advising that it would rehear the case en banc.

Significantly, in that same order the court withdrew the panel's pending, nonfinal initial opinion. Significant, as well: Thereafter, the author both of the panel majority's initial opinion and of its opinion on rehearing reached mandatory retirement age and departed the court. Pursuant to the court's usual practice, a substitute judge was assigned to the panel in his place.

At that point, then, en banc disposition could no longer be necessary either to maintain uniformity in the decisions of the court or to decide a case or issue of exceptional importance. Rule 9.331(a), (d)(1). As the en banc majority has mentioned, the initial panel decision withdrawn by the court no longer exists. It is not even viewable electronically or online other than as photocopied in an appendix that was filed with an unsuccessful writ petition in the Florida Supreme Court. See Shrader v. State, SC17-2172, 2018 WL 542350, at *1 (Fla. Jan. 25, 2018). The panel majority's rehearing opinion was never released. Neither opinion can ever be resurrected because their author retired and the panel from which they emanated no longer exists as such.

Manifestly, the initial panel majority opinion—abandoned by the panel on rehearing and then withdrawn by the court—can never be the basis of a decision that must be harmonized with any other. Further, the en banc majority's complaints about that opinion pertain not to any principle of law expressed in it, but only to perceived errors in the application of established law by a specific panel majority that can never again exist. It is self-evident that neither the case itself nor any issue in it are inherently of exceptional importance. Because it is not necessary to dispose of this case en banc and doing so would serve no purpose for which rule 9.331 was devised, the court should refrain from doing so.

**IV.** **Shrader's convictions for felony murder and sexual battery must be reversed because the State failed to prove that the intercourse between Shrader and the victim was not consensual. The en banc majority's argument to the contrary is premised on a significant misunderstanding of the facts.**

The day before the victim's death was Super Bowl Sunday, and that night she was hopping from bar to bar, asking patrons for rides from one place to the next. Roughly seven hours elapsed between the time she was last seen alive at the third bar she was known to have visited, The 18 Wheeler Lounge, and the discovery of her body at Whiskey Stump, an isolated rural place where people trespassed in order to go fishing and camping and to use it as a lover's lane. Before that discovery, two events occurred that formed the gravamen of the murder and sexual battery charges against Shrader: the victim was stabbed to death, and the victim had or was subjected to vaginal and anal intercourse. For those events to support Shrader's convictions for felony murder and sexual battery, the State had to prove that he committed the homicide while in the perpetration of the intercourse and that the intercourse was not consensual.

It did neither. At most, the State's evidence showed simply that Shrader was the one who killed the victim and that he was the one who had sex with her sometime, perhaps hours, before her death. Obviously, those two circumstances standing alone would not support a rational inference that the sex was nonconsensual. See Wright, 221 So. 3d at 521 ("[S]uspicions alone cannot satisfy the State's burden of proving guilt beyond a reasonable doubt." (quoting Ballard, 923 So. 2d at 482)); Scaglione v. State, 62 So. 2d 417, 417 (Fla. 1953) (holding that convictions based on "guesswork and speculation on the part of the jury" must be reversed); Keys v. State,

606 So. 2d 669, 673 (Fla. 1st DCA 1992) (explaining that verdicts or judgments may not be based on speculation).

Accordingly, and as it must, the en banc majority relies on an additional circumstance: When interviewed by detectives, Shrader denied ever knowing the victim and made other inconsistent or false statements. The majority argues that Shrader's evasiveness was evidence of his consciousness of guilt which, combined with the presence of Shrader's DNA inside the victim, proved that he committed sexual battery.[19] The majority invokes the line of cases holding that "[w]hen a suspected person in any manner attempts to escape or evade a threatened prosecution by flight, concealment, resistance to lawful arrest, or other indications after the fact of a desire to evade prosecution, such fact is admissible, being relevant to the consciousness of guilt which may be inferred . . . ." Straight v. State, 397 So. 2d 903, 908 (Fla. 1981).

But that principle is inapplicable in the context of the alleged sexual batteries. Because juries are permitted to draw only reasonable, rational inferences, the law also makes clear that consciousness of guilt may be inferred only when the evidence shows that the suspect's evasions were an attempt to avoid responsibility for the crime for which the jury is called upon to infer guilt. Absent an evidentiary nexus between the evasion and the crime being submitted to the jury, as opposed to another crime that the suspect might have been accused of, a jury could not rationally infer that his evasion stemmed from an awareness that he is guilty of the charge before it. See,

_____

[19]"Under the facts of this case," the majority writes, "Shrader's DNA found inside the victim is direct evidence of Shrader's participation in the crime of sexual battery. Indeed, this is so because Shrader denied even knowing the victim, let alone having sexual contact with her."

- 46 -

e.g., Adderly v. State, 44 So. 3d 167, 170–171 (Fla. 4th DCA 2010) (reversing conviction where defendant's flight months after robbery and at a time when there was an outstanding warrant naming him in another crime could not properly support an inference of his consciousness of guilt of the robbery for which he was tried).

Note that this nexus must be established by actual evidence, not by inference; otherwise the jury would be called upon to stack an inference that the defendant was aware of his guilt atop a mere inference that the defendant's evasion related to the charge at hand and not another. This would be improper. See, e.g. Wright, 221 So. 3d at 524 (noting that evidence is insufficient to support a conviction if it requires pyramiding of assumptions or impermissibly stacked inferences); Keys, 606 So. 2d at 673 (explaining that the purpose of rule against stacking inferences is to protect against verdicts or judgments based on speculation).

Here, Shrader made his evasive statements during two interviews conducted in January and February 2011. On those occasions, the detectives told Shrader that they were investigating an old homicide. Contrary to implications in the en banc majority opinion, the detectives did not tell Shrader that they were investigating a sexual battery.

Indeed, although those interviews were conducted after Shrader's DNA had been matched to the blood samples taken from the scene where the victim was found, the report matching Shrader's DNA to the seminal fluid found in the victim was not issued until April 2011, well after the detectives interviewed Shrader.[20] Thus, the

---

[20]The en banc majority's statement that in 2010 Shrader's DNA was matched to samples taken from the victim's "rape kit" is incorrect if the assertion is meant to suggest that at that time his DNA was matched to the seminal fluid found in

- 47 -

majority's claim that "prior to being confronted with DNA evidence that he had sex with the victim, Shrader not only denied that he and the victim had any sexual contact, but completely denied ever having met the victim or otherwise knowing who she was" is simply untrue insofar as it implies that Shrader changed his story after being "confronted" with DNA evidence that he had sex with the victim. Because the detectives had no such evidence, they did not confront Shrader with it, and therefore he did not change his story as a result. To the contrary, in neither interview did the detectives allude to any evidence that the victim had participated in or had been subjected to sexual activity.

At the time Shrader made his evasive statements, then, the only mentioned topic of the interviews—and therefore the only pertinent charge that he might have been attempting to evade—was the victim's homicide. Those statements may have been admissible and relevant to the premeditated first-degree murder charge for which Shrader was tried. But they simply were not competent substantial evidence that he had committed sexual battery, and therefore, they could not support his convictions for sexual battery or felony murder. See Adderly, 44 So. 3d at 170.

---

the victim. The FDLE received the samples in April 2007, at which time they were entered into the FBI's Combined DNA Index System, or "CODIS," which turned up no immediate hits. In 2010, Shrader's conviction on an unrelated charge required him to submit a DNA sample. CODIS then matched Shrader's known DNA profile with the partial profiles developed from blood contained in a sample of soil taken from the vicinity of the victim. However, results were inconclusive regarding DNA evidence that the FDLE had developed from the semen samples taken from the victim. Later, the samples were sent to a private laboratory for further testing. In April 2011, three months after investigators' first interview with Shrader and two months after the second one, the private laboratory issued a report of its findings: Blood in the two soil samples matched the known DNA profile of Shrader. In addition, the sperm fraction developed from the seminal fluid recovered from the victim matched the known DNA profile of Shrader.

Thus, there was absolutely no evidence to show that the homicide of the victim was committed while in the perpetration of Shrader's intercourse with her or that the intercourse was nonconsensual. As such, this case is miles apart from the ones relied upon by the en banc majority. In Williams v. State, 967 So. 2d 735, 744 (Fla. 2007), the defendant was convicted of premeditated murder as well as felony murder based on an underlying sexual battery. Id. at 744. The victim, his girlfriend's sister's roommate, died nineteen days after she was stabbed multiple times in the apartment where she was staying. Id. at 741–43. There were bite marks on her chest, arm, breast, back of her shoulder, and groin. Id. She was nearly eight months pregnant and was in a committed relationship with the father. Id. at 743. Investigators found the victim's blood-stained shorts and panties on the bed under some bloody sheets in a condition that "indicated they were removed either during or in close proximity to the attack." Id. at 756. Most important, beginning with the victim's 911 call the morning of the crime and at other times thereafter, she made excited utterances and dying declarations stating that the defendant had attacked and raped her. Id. at 741.

The defendant in McWatters v. State, 36 So. 3d 613 (Fla. 2010), was convicted of murdering and sexually battering three women. Id. at 619. Vis-a-vis the sexual battery convictions, the supreme court determined that the victims' nonconsent was proved by a variety of evidence: The defendant engaged in a pattern of speaking with victims about selling them drugs, then taking them to remote, secluded locations where he engaged in sex with them and killed them by strangulation. Id. at 628. The victims were found with their clothes pushed up under their armpits and down around their ankles. Id. at 619, 621, 622. Other items of their clothing were strewn around the

areas where the bodies were found.  Id.  The jury heard expert opinions from the medical examiner and a police investigator that the circumstances indicated rape-homicides.  Id. at 619, 621.  Most significantly, although maintaining that the sexual encounters were consensual, the defendant acknowledged that he killed the victims while he was having sex with them.  Id. at 623–24.

> [W]hen asked about the circumstances of the killings in general, McWatters stated that the "last thing [he] remember[ed] [was] having sex with [the victims] and [he] was on top of them."  He agreed that he was "literally in the process of having sex" when he killed the women.  The jury could have reasonably inferred that the defendant should have understood that any consent to sex given by the victims, including Bradley, was terminated when he began to choke them.  The fact that each woman was killed during sexual intercourse—which is based on McWatters' admission—is evidence supporting the finding that at some point, the sexual activity became nonconsensual.

Id. at 634.

Lightbourne v. State, 438 So. 2d 380 (Fla. 1983), involved charges of premeditated murder and felony murder based on the underlying felonies of burglary and sexual battery.  The evidence showed that

> [a] screen had been cut and a window of [the] victim's house had been pried open and broken.  Testimony revealed that the defendant had admitted surprising the victim in her home, that he took some money, a necklace, and a small silver coin bank.  The phone cords had been severed.

Id. at 390–391.  Further, viable sperm and semen discovered in the victim's vagina indicated sexual relations at approximately the time of death.  Id. at 391.  Perhaps the most damning evidence was testimony by a witness[21] to whom the defendant had

---

[21]It is difficult to discern from the Lightbourne opinion whether this witness was a police officer or the defendant's cellmate.

- 50 -

confided that during the burglary he held a gun to the victim and forced her "into acts of oral sex and intercourse as she begged him not to kill her." Id. at 391.

Similarly, in Fitzpatrick v. State, 900 So. 2d 495, 503–04 (Fla. 2005), the defendant was found guilty of first-degree murder and sexual battery after an expert testified that the amount of seminal fluid found in the homicide victim's vagina and anus, coupled with significant redness and bruising in those areas and on her breasts, evidenced nonconsensual sexual activity an hour or two before her body was found. Further, the victim was found with a bloody undergarment around her waist near her breasts. Id. The expert concluded that the victim had not worn the garment after the sexual activity, owing to the lack of semen on it. Id.

The majority's reliance on State v. Ortiz, 766 So. 2d 1137 (Fla. 3d DCA 2000), adds nothing to this discussion for the simple reason that in that case the court did not review the sufficiency of evidence to support a conviction. Rather, Ortiz was the State's appeal from an order granting the defendant's pretrial motion to dismiss on the ground specified by Florida Rule of Criminal Procedure 3.190(c)(4), i.e., that there were "no material disputed facts and the undisputed facts do not establish a prima facie case of guilt against the defendant." Id. at 1138. The undisputed record evidence indicated that the murder victim's body had been burned. Id. Even so, it could be discerned that the victim was nude, that there were remnants of clothing around her feet and head, and that she had been strangled. Id. at 1139–41. Largely based on scientific literature addressing cases involving similar elements, the deputy medical examiner opined that the decedent may have been the victim of a rape or attempted rape during the course of the murder. Id. at 1139. When reversing the circuit court's

dismissal order, the Third District pointed out that when opposing a motion to dismiss, the State need not adduce evidence sufficient to sustain a conviction. Id. at 1142. "Even if the trial court doubts the sufficiency of the state's evidence, it cannot grant a motion to dismiss criminal charges simply because it concludes that the case will not survive a motion for a judgment of acquittal." Id. (quoting State v. Paleveda, 745 So. 2d 1026, 1027 (Fla. 2d DCA 1999)).

It is important to note that in none of the foregoing cases cited by the majority did the reviewing courts hold that the fact that a defendant killed the victim in and of itself supported an inference that sexual contact between them was nonconsensual. Certainly, any such inference would be speculative. Rather, in each case the court analyzed the related physical and expert evidence (as well as the defendants' admissions in two cases and the victim's dying declarations in another) to determine whether the State proved the nonconsent element of the sexual battery offense.

In that endeavor the supreme court specifically relied on evidence that the respective victims in the cases before it had been involved in sexual activity at or near the times they were fatally attacked. This temporal proximity was important for two reasons pertinent to the instant case: First, a felony murder conviction requires a determination that the homicide was committed by a person "engaged in the perpetration of, or in the attempt to perpetrate" the underlying qualifying felony. § 782.04(1)(a)(2), Fla. Stat. (1985); Dean v. State, 230 So. 3d 420, 423 (Fla. 2017) (observing that statutory requirement that the victim be killed "in the perpetration of" the underlying felony creates an element of causation between the defendant's act of

- 52 -

committing the felony and the death of the victim); Allen v. State, 690 So. 2d 1332, 1334 (Fla. 2d DCA 1997) ("In any felony murder conviction the element of causation, i.e. that the homicide was committed in the perpetration of the felony, must be established."). Second, as described in the cases relied upon by the majority, the occurrence of sexual activity during or near the time of the fatal violence supported an inference that the sex was not consensual. See Monarca v. State, 412 So. 2d 443, 446–47 (Fla. 5th DCA 1982) (observing that in order to prove a sexual battery under section 794.011(3), the State must prove, among other things, that the victim did not consent).

In contrast, here there was no evidence whatever that the victim engaged in or was subjected to sexual activity at or near the time of her death. In fact, as will be seen, the evidence suggested otherwise.

The proof at trial firmly established that the homicide was committed shortly before the victim was discovered seven hours following her last sighting. This was apparent because her body was still warm even though it was found outdoors and partially nude on a bitterly cold morning. Still, it could not be established that the attack occurred where the body was found. The tee shirt the victim was wearing when she was found was not the one she wore when last seen the night before. Obviously, she had obtained different clothing in the interim, suggesting that she had visited another location or locations before she or her body arrived at Whiskey Stump. The medical examiner first observed the victim's body where it lay when found. Although the amount of blood in the immediate vicinity caused him to suppose that she was attacked at that spot, he also posited that she could have been stabbed elsewhere and then dumped there and bled out. "You really can't tell," he testified. "You really can't tell." He noted

that the presence of tire tracks suggested the involvement of a vehicle. And although soil samples taken from the scene contained Shrader's blood as well as the victim's, the medical examiner testified that it was not uncommon for an assailant to cut himself when stabbing someone and that he could have been bleeding when he arrived there and left the body.

The medical examiner testified that there were defensive wounds on the victim's arm and hand and that the pattern of her stab wounds was consistent with someone moving and trying to fend off an attack. Yet, although a dozen or so people were camping near the spot where the body was found, no one testified to hearing shouts or other signs of an attack.

It is true, as the majority notes, that the deputy who discovered the body testified at trial nearly three decades later that he saw signs of a scuffle in the vicinity. (This assertion was not corroborated by the other witnesses or crime scene photographs.) Regardless, signs of a scuffle at the place where the victim likely struggled to fend off a knife attack had no rational bearing on the question of whether Shrader's sexual contact with her sometime during the preceding hours was consensual. Neither the medical examiner nor any other witness could say where or when the sex took place or when it occurred specifically in relation to the homicide.

There were, however, several circumstances that possibly shed some general light on the timing and nature of the sexual encounter with Shrader. First, recall that in some of the cases relied upon by the majority, the presence of large amounts of semen and seminal fluid in the victims' bodies showed that the sex occurred at or near the times of their deaths, in turn supporting an inference that the sex was

nonconsensual.  Indeed, in his testimony the medical examiner attested that seminal fluid drains from a body over time.

In this case, then, it was significant that only minute traces of seminal fluid were found in the victim's body.  This strongly suggested that, whereas the victim most assuredly was killed shortly before her warm body was discovered early on that frigid morning, her sexual encounter with Shrader occurred well before then.  The absence of any appreciable amount of seminal fluid within the victim also demonstrated that even if the homicide took place where her body was found, the sex did not; the State offered no evidence that semen was found in the soil samples taken from beneath or near the body.

The evidence here contrasted sharply with the circumstances in the en banc majority's cited cases in another important way, that being the state of the victim's clothing.  The opinions cited by the majority described the victims' clothing as having been strewn about the scenes and otherwise pushed over their breasts or down around their ankles, consistent with frenetic sexual attacks.  Not so in this case.  Here the victim's tee shirt was not askew or pushed up.  It was in place and it covered her torso.  No other clothing was found at the scene, strewn or otherwise.  Thus, although the multiple stab wounds certainly manifested the assailant's frenzy, there was nothing at the scene to indicate that the attack included a sexual battery.[22]

_____

[22]In closing argument to the jury, the prosecutor claimed (without objection) that the victim had been found unclothed except for the tee shirt "that was pulled up around her neck."  But according to the State's own evidence, the latter detail was incorrect.  It is true that one of the crime scene photographs depicted the victim on her back with her tee shirt pulled above her breasts.  But according to the other photographs taken that day, as well as the testimony of the deputy who discovered the body, the victim was not on her back when she was found.  Rather, she lay on her side

Finally, although the medical examiner cautioned that the absence of physical trauma did not prove that the victim had not been sexually battered, he recounted that his examination of the victim's body produced no physical evidence that she had been. Her body bore no scrapes, lacerations, bruising, tearing of the vagina or rectum, or any other indicia of a sexual attack. Most telling, perhaps, was this: There was no foreign DNA in scrapings taken from beneath the victim's fingernails. In other words, whereas the victim had suffered wounds defending herself from the fatal attack, she had not scratched Shrader during their sexual encounter.

In sum, the prosecution offered substantial proof that Shrader killed the victim shortly before her body was discovered and that he'd had sex with her sometime during the preceding hours. But that was all that the evidence showed, and it wasn't enough to prove a sexual battery. The State did not prove where either the sex or the death occurred; it did not show when the sex took place; it offered not one scintilla of evidence that the sex was not consensual. To the contrary, to the extent that any evidence at trial bore on those questions, it contradicted the prosecution's case.

Given the decades that separated the crime or crimes and Shrader's prosecution, the State's case was bound to suffer evidentiary shortcomings. But that did not relieve it of its burden to prove every element of every charge beyond a

with her face and chest turned down toward the ground. As depicted in the crime scene photographs, when the victim was found the tail of her tee shirt had crept up a few inches from her waist, but the shirt otherwise fully covered her torso. Also, the shirt bore holes where it had been penetrated by the assailant's weapon. In other words, the victim was stabbed through her shirt. The shirt could not have been pulled up around her neck during the attack, and contrary to the prosecutor's assertion in closing argument, it was not found that way. Most likely, during the crime scene investigation the victim was rolled onto her back and her shirt was pulled up so that the wounds to her chest could be photographed.

reasonable doubt. Because its evidence gave the jury only a speculative basis for assuming that the victim's sexual contact with Shrader was not consensual, the State failed to prove the sexual battery charges as matter of law. The panel majority reasonably reversed Shrader's convictions and remanded for a new trial for second-degree murder. Be that as it may, there is no permissible basis for revisiting that decision en banc. Just as importantly, there is no useful purpose in doing so.